**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**WESTERN DIVISION**

CARRIE AGNES BERKE,

           Claimant,

vs.

ANDREW W. SAUL,
Commissioner of Social Security,

           Defendant.

No. 19-CV-4042-MAR

**ORDER**

_____

**TABLE OF CONTENTS**

Page

I.    *BACKGROUND* ................................................................. **3**

II.   *DISABILITY DETERMINATIONS AND THE BURDEN OF PROOF* ......... **4**

    A.    *The ALJ'S Findings* ................................................. **7**

    B.    *The Substantial Evidence Standard* ............................. **8**

III.  *DISCUSSION* ................................................................. **9**

    A.    *Whether the Record as a Whole Supports the ALJ's Finding that Claimant's Atrial Fibrillation, Headaches, and Asthma were Nonsevere Impairments* ................................................. **10**

        1.   *Atrial Fibrillation* ........................................ **13**

        2.   *Headaches* ................................................. **16**

        3.   *Asthma* ..................................................... **17**

1

***4.*** ***Combination of Impairments***…………………………………………**18**

***B.*** ***Whether the ALJ Correctly Considered Claimant's Impairments Under Listing 12.05(B)***…………………………………………………………………**19**

    ***1.*** ***Claimant's GAF Score of 47***……………………………………**21**

    ***2.*** ***Claimant's Full-Scale I.Q. Score of 77***……………………**24**

    ***3.*** ***Other Support for the ALJ's Contested Step Three Findings***…**30**

        ***a.*** ***Limitations in Understanding, Remembering, or Applying Information***…………………………………………**31**

        ***b.*** ***Limitations on Interacting with Others***……………………**32**

        **c.** ***Limitations on Concentrating, Persisting, or Maintaining Pace***…………………………………………………**33**

    ***4.*** ***Conclusion***……………………………………………………**33**

***C.*** ***Whether the ALJ Provided Good Reasons for the Weight Afforded Dr. Lukken's Opinion***…………………………………………………………**34**

    ***1.*** ***Legal Standard for Evaluating Dr. Lukken's Opinion***…………**35**

    ***2.*** ***Analysis***………………………………………………………**36**

        ***a.*** ***Length and Frequency of Treatment Relationship***………**36**

        ***b.*** ***Nature and Extent of Treatment Relationship***……………**36**

        ***c.*** ***Supportability***………………………………………………**37**

        ***d.*** ***Consistency***…………………………………………………**41**

        ***e.*** ***Specialization***………………………………………………**47**

        ***f.*** ***Conclusion***…………………………………………………**48**

2

  **D.**  ***Whether the ALJ Proffered a Hypothetical to the VE that was Supported by the Record*** ............................................................................**48**

    **1.**  ***Legal Standard for Evaluating the Hypothetical and Claimant's Arguments*** .................................................................**49**

    **2.**  ***Analysis*** .........................................................................**49**

      **a.**  ***Arguments Previously Addressed*** ..............................**49**

      **b.**  ***Evaluation of Claimant's Testimony*** ..........................**51**

      **c.**  ***Evaluation of Ms. Matheny's Testimony*** .....................**59**

      **d.**  ***Effect of ALJ's Decisions on Hypotheticals at Step Five*** .................................................................**62**

**IV.**  **CONCLUSION** ...............................................................................**62**

Plaintiff Carrie Agnes Berke ("Claimant") seeks judicial review of a final decision of the Commissioner of Social Security ("the Commissioner") denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. Sections 401-34. Claimant contends that the Administrative Law Judge ("ALJ") erred in determining that she was not disabled. For the reasons that follow, the Commissioner's decision is **affirmed**.

## *I.*   *BACKGROUND*

I adopt the facts set forth in the Parties' Joint Statement of Facts (Doc. 14) and only summarize the pertinent facts here. This is an appeal from a denial of DIB. Claimant was born November 2, 1971. (AR[1] at 218.) Claimant has a ninth-grade education and is able to communicate in English. (*Id.* at 24, 218.) She allegedly became disabled due to

---

[1] "AR" cites refer to pages in the Administrative Record.

atrial fibrillation, morbid obesity, panic disorder, attention deficit hyperactivity disorder, behavioral (non-epileptic) spells, anxiety disorder, PTSD, a learning disability, asthma, and a thyroid disorder. (*Id.* at 231.) Claimant's original onset of disability date was July 1, 2014, but was later amended to September 25, 2014. (*Id.* at 39, 218.) Claimant filed an application for DIB on September 27, 2016. (*Id.*) Her claim was denied originally and on reconsideration. (*Id.* at 145-48, 156-64.) A video hearing was held on September 25, 2018, with Claimant and her attorney, Jay E. Denne, in Sioux City, Iowa and ALJ Matt Bring in Fargo, North Dakota.[2] (*Id.* at 33-72.) Vocational Expert ("VE") Tammie C. Donaldson and Claimant's daughter, Cheyanne Matheny also appeared. (*Id.* at 10.) Claimant, the VE, and Ms. Matheny all testified. (*Id.* at 39-72.) The ALJ issued an unfavorable decision on January 10, 2019. (*Id.* at 7-34.)

Claimant requested review and the Appeals Council denied review on April 30, 2019. (*Id.* at 1-4.) Accordingly, the ALJ's decision stands as the final administrative ruling in the matter and became the final decision of the Commissioner. *See* 20 C.F.R. § 416.1481.

On July 12, 2019, Claimant timely filed her complaint in this Court. (Doc. 3.) On September 23, 2019, the parties consented to proceed before a Magistrate Judge and the Honorable Leonard T. Strand reassigned the case to me for final disposition. (Doc. 6.) All briefing was completed and the case was ready for decision on March 25, 2020. (Doc. 18.)

## II.    *DISABILITY DETERMINATIONS AND THE BURDEN OF PROOF*

A disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to

---

[2] The ALJ's decision states that the ALJ presided over the hearing from Omaha, Nebraska. (AR at 10.) The Court assumes this is a typographical error because the ALJ stated on the record that he was "holding this hearing by video from Fargo, North Dakota." (*Id.* at 35.)

4

result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant has a disability when, due to physical or mental impairments, the claimant

> is not only unable to do [the claimant's] previous work but cannot, considering [the claimant's] age, education, and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). A claimant is not disabled if the claimant is able to do work that exists in the national economy but is unemployed due to an inability to find work, lack of options in the local area, technological changes in a particular industry, economic downturns, employer hiring practices, or other factors. 20 C.F.R. § 404.1566(c).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows the five-step sequential evaluation process outlined in the regulations. *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003). At steps one through four, the claimant has the burden to prove he or she is disabled; at step five, the burden shifts to the Commissioner to prove there are jobs available in the national economy. *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009).

At step one, the ALJ will consider whether a claimant is engaged in "substantial gainful activity." *Id.* If so, the claimant is not disabled. 20 C.F.R. § 416.920(a)(4)(i). "Substantial activity is significant physical or mental work that is done on a full- or part-time basis. Gainful activity is simply work that is done for compensation." *Dukes v. Barnhart*, 436 F.3d 923, 927 (8th Cir. 2006) (citing *Comstock v. Chater*, 91 F.3d 1143, 1145 (8th Cir. 1996); 20 C.F.R. § 416.972(a),(b)).

If the claimant is not engaged in substantial gainful activity, at step two, the ALJ decides if the claimant's impairments are severe. 20 C.F.R. § 416.920(a)(4)(ii). If the

5

impairments are not severe, then the claimant is not disabled. *Id.* An impairment is not severe if it does not significantly limit a claimant's "physical or mental ability to do basic work activities." *Id.* § 416.920(c). The ability to do basic work activities means the ability and aptitude necessary to perform most jobs. *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987) (quoting 20 C.F.R. §§ 404.1521(b), 416.921(b)). These include

> (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting.

*Id.* (quotation omitted) (numbers added; internal brackets omitted).

If the claimant has a severe impairment, at step three, the ALJ will determine the medical severity of the impairment. 20 C.F.R. § 416.920(a)(4)(iii). If the impairment meets or equals one of the impairments listed in the regulations ("the listings"), then "the claimant is presumptively disabled without regard to age, education, and work experience." *Tate v. Apfel*, 167 F.3d 1191, 1196 (8th Cir. 1999) (quotation omitted).

If the claimant's impairment is severe, but it does not meet or equal an impairment in the listings, at step four, the ALJ will assess the claimant's residual functional capacity ("RFC") and the demands of the claimant's past relevant work. 20 C.F.R. § 416.920(a)(4)(iv). RFC is what the claimant can still do despite his or her limitations. *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005) (citing 20 C.F.R. §§ 404.1545(a), 416.945(a)). RFC is based on all relevant evidence and the claimant is responsible for providing the evidence the Commissioner will use to determine the RFC. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004). "Past relevant work" is any work the claimant performed within the fifteen years prior to his application that was substantial gainful activity and lasted long enough for the claimant to learn how to do it.

6

20 C.F.R. § 416.960(b)(1). If a claimant retains enough RFC to perform past relevant work, then the claimant is not disabled. *Id.* § 416.920(a)(4)(iv).

At step five, if the claimant's RFC will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to show there is other work the claimant can do, given the claimant's RFC, age, education, and work experience. *Id.* §§ 416.920(a)(4)(v), 416.960(c)(2). The ALJ must show not only that the claimant's RFC will allow the claimant to do other work, but also that other work exists in significant numbers in the national economy. *Eichelberger*, 390 F.3d at 591 (citation omitted).

## A.    *The ALJ'S Findings*

As an initial finding, the ALJ found that Claimant last met the insured status requirements of the Social Security Act on June 30, 2017. (AR at 12.) The ALJ then made the following findings at each step of the five-step process regarding Claimant's disability status.

At step one, the ALJ found that Claimant had not engaged in substantial gainful activity from her alleged onset of disability date of September 25, 2014 through her last date insured of June 30, 2017. (*Id.* at 12.)

At step two, the ALJ found that Claimant suffered from the following severe impairments: lumbar degenerative disc disease; obesity; episodes of syncope; major depressive disorder; anxiety; post-traumatic stress disorder; and borderline intellectual functioning/learning disorder. (*Id.*)    The ALJ found Claimant's atrial fibrillation, headaches, and asthma to be nonsevere impairments. (*Id.* at 12-13.)

At step three, the ALJ found that Claimant did not have an impairment or combination of impairments that met or equaled a presumptively disabling impairment listed in the regulations, either when considered singly or in combination. (*Id.* at 13-14.)

The ALJ evaluated Claimant's claims under listings 1.04 (disorders of the spine), various 11.00 listings (various "neurological system disorders" as a proxy for syncope),

12.04 (depressive, bipolar and related disorders), 12.05 (intellectual disorders), 12.06 (anxiety and obsessive compulsive disorders), and 12.11 (neurodevelopmental disorders). (*Id.* at 14-17.) The ALJ considered the effect Claimant's obesity would have on her ability to work and those limitations were "reflected in [her] . . . residual functional capacity." (*Id.* at 14, 18.)

At step four, the ALJ found that through the last date insured, Claimant had the following RFC:

> [T]he claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) with the following additional limitations: occasional climbing of ramps and stairs; no climbing of ladders, ropes and scaffolds; occasional balancing, stooping, kneeling, crouching and crawling; no exposure to unprotected heights or moving mechanical parts; and no operation of a motor vehicle as part of her job duties. Mentally, the claimant is limited to simple, routine tasks and simple work-related decisions with only occasional changes, and occasional contact with the public and coworkers.

(*Id.* at 17.) The ALJ also found that Claimant had no past relevant work. (*Id.* at 24.)

At step five, the ALJ found that during the relevant time period there were jobs that existed in significant numbers in the national economy that Claimant could have performed, including housekeeper cleaner, inspector packer, and garment bagger. (*Id.* at 25.) Therefore, the ALJ concluded that Claimant was not disabled from September 25, 2014 through June 30, 2017. (*Id.*)

## B.   *The Substantial Evidence Standard*

The ALJ's decision must be affirmed "if it is supported by substantial evidence on the record as a whole." *Moore*, 572 F.3d at 522. "The phrase 'substantial evidence' is a 'term of art' used throughout administrative law. . . . [T]he threshold for such evidentiary sufficiency is not high. . . . It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek*

Case 5:19-cv-04042-MAR   Document 19   Filed 11/20/20   Page 8 of 62

*v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations and quotations omitted). The court cannot disturb an ALJ's decision unless it falls outside this available "zone of choice" within which the ALJ can decide the case. *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006) (citation omitted). The decision is not outside that zone of choice simply because the court might have reached a different decision. *Id.* (citing *Holley v. Massanari*, 253 F.3d 1088, 1091 (8th Cir. 2001)); *Moore*, 572 F.3d at 522 (holding that the court cannot reverse an ALJ's decision merely because substantial evidence would have supported an opposite decision).

In determining whether the Commissioner's decision meets this standard, the court considers all the evidence in the record, but does not reweigh the evidence. *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005). A court considers both evidence that supports the ALJ's decision and evidence that detracts from it. *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010). The court must "search the record for evidence contradicting the [ALJ's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1991)).

## III. DISCUSSION

Claimant alleges the ALJ committed reversible error by (A) failing to find Claimant's atrial fibrillation, headaches, and asthma were severe impairments; (B) "failing to correctly consider her mental impairment when considering [listing] 12.05c"; (C) failing to properly weigh the opinion of Dr. Wade Lukken; and (D) failing to "give appropriate consideration" to Claimant's impairments and other evidence in the record (Doc. 15 at 13-14), which resulted in the ALJ crafting an inappropriate RFC and a faulty hypothetical.

9

*A.* **Whether the Record as a Whole Supports the ALJ's Finding that Claimant's Atrial Fibrillation, Headaches, and Asthma were Nonsevere Impairments**

As discussed above, at step two, the ALJ decides if the claimant's impairments are severe. 20 C.F.R. § 416.920(a)(4)(ii). If the impairments are not severe, then the claimant is not disabled. *Id.* An impairment is not severe if it does not significantly limit a claimant's "physical or mental ability to do basic work activities." *Id.* § 416.920(c). The ability to do basic work activities means the ability and aptitude necessary to perform most jobs. *Bowen*, 482 U.S. at 141 (quoting 20 C.F.R. §§ 404.1521(b), 416.921(b)).

Claimant argues that at step two of the analysis the ALJ should have found her atrial fibrillation, headaches, and asthma to be severe impairments. (Doc. 15 at 5-6.) Specifically, Claimant asserts that the ALJ failed to consider "how repeated hospitalizations and treatment caused by these impairments would have a significant impact on her ability to work [because] missing work and requiring additional breaks on an unscheduled basis renders a person unemployable." (*Id.* at 5.) She argues that having a pacemaker and a history of emergency room visits for migraines requires remand for further proceedings. (Doc. 17 at 1-2.) Finally, Claimant argues that the ALJ failed to consider the combined effects of all of her conditions, which may not be "disabling in and of themselves as the ALJ concluded, [but] are nevertheless severe impairments." (Doc. 15 at 6.) "[T]he failure to find a particular impairment severe at step two is not reversible error as long as the ALJ finds that at least one other impairment is severe." *Marion v. Saul*, No. 19-CV-76-LRR, 2020 WL 2482124, at *22 (N.D. Iowa Apr. 21, 2020) (quoting *Dray v. Astrue*, 353 Fed. Appx. 147, 149 (10th Cir. 2009)), *R. & R. adopted sub nom. Marion v. Comm'r of Soc. Sec.*, 2020 WL 2475579 (N.D. Iowa May 13, 2020). This Court previously addressed this issue in *Berry v. Colvin*, which Claimant cites. 74 F. Supp. 3d 994 (N.D. Iowa 2015). The following quotation addressed a citation in the Commissioner's brief in *Berry*.

The Commissioner also argues that an ALJ's failure to find a particular impairment severe at Step Two is not reversible error if the ALJ finds at least one other impairment to be severe. Doc. No. 13 at 6. This argument is logical. The purpose of Step Two is "to weed out at an early stage of the administrative process those individuals who cannot possibly meet the statutory definition of disability." *Bowen v. Yuckert,* 482 U.S. 137, 156, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987) (O'Connor, J., concurring). In formulating a claimant's RFC the ALJ must consider the combined effects of all medically-determinable impairments, whether severe or non-severe. *Ford v. Astrue,* 518 F.3d 979, 981 (8th Cir. 2008) (citing 20 C.F.R. § 404.1545(a)). Thus, so long as the ALJ does not terminate the sequential evaluation process at Step Two, there is little basis to argue that the characterization of one impairment as "non-severe" constitutes reversible error.

*Id.* at 1001 n.2; *see also Hill v. Colvin,* No. C14-4105-CJW, 2016 WL 1261099, at *5 (N.D. Iowa Mar. 30, 2016) (reaching the same conclusion regarding the alleged combined effects of impairments). Therefore, even if the ALJ had erred in not finding specific impairments severe, Claimant has not provided any evidence that the ALJ would have decided differently if the errors had not occurred. *See Byes v. Astrue*, 687 F.3d 913, 917 (8th Cir. 2012); *Van Vickle v. Astrue*, 539 F.3d 825, 830 (8th Cir. 2008). The ALJ's decision on this issue will be affirmed.

That being said, I will address each of Claimant's arguments separately because doing so will help the analyses of arguments that arise later in this order.

If [an] impairment would have no more than a minimal effect on the claimant's ability to work, it is not severe. [*Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007).] It is the claimant's burden to establish that his or her impairment or combination of impairments is severe. *Mittlestedt v. Apfel,* 204 F.3d 847, 852 (8th Cir. 2000). "Severity is not an onerous requirement for the claimant to meet, but it is also not a toothless standard. . . ." [*Kirby v. Astrue,* 500 F.3d 705, 708 (8th Cir. 2007)] (internal citation omitted). When a claimant has multiple impairments, "the Social Security Act requires the Commissioner to consider the combined effect of all impairments without regard to whether any such impairment,

if considered separately, would be of sufficient medical severity to be disabling." *Cunningham v. Apfel,* 222 F.3d 496, 501 (8th Cir. 2000).

74 F. Supp. at 1000–01 (ellipses in original; paragraph break omitted).

Claimant argues that "although this is not a 'toothless' burden of proof, the claimant's burden is not an onerous one. . . . In essence it is a *de minimis* standard, as it was noted that if the impairment would have no more than a minimal effect on the claimant's ability to work, it is not severe." (Doc. 15 at 5.) I cannot agree with Claimant's characterization of her burden of proof as "*de minimis.*" *Black's Law Dictionary* defines *de minimis* as "1. Trifling; negligible. 2. (Of a fact or thing) so insignificant that a court may overlook it in deciding an issue or case." (11th ed. 2019). *Merriam-Webster* defines toothless as "lacking in means of enforcement or coercion: ineffectual." https://www.merriam-webster.com/dictionary/toothless. Thus, the definition of *de minimis* is the very essence of "toothless." Neither ALJs nor reviewing courts consider the quality of evidence a claimant provides to substantiate claims to be "so insignificant that [they] may overlook it in deciding the issue" of whether an impairment is severe.

A "severe impairment is defined as one which 'significantly limits [the claimant's] physical or mental ability to do basic work activities.'" *Pelkey v. Barnhart,* 433 F.3d 575, 577 (8th Cir. 2006) (quoting 20 C.F.R. § 404.1520(c)). The impairment

> must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [the claimant's] statement of symptoms (see [20 C.F.R.] § 404.1527).

20 C.F.R. § 404.1508.

12

*Martise v. Astrue*, 641 F.3d 909, 923 (8th Cir. 2011) (brackets in original). A claimant does not have a severe impairment when she does not provide adequate objective evidence to substantiate her claims. *See id.* at 923-24. Therefore, the standard is not toothless. At step two of the five step process, the ALJ separately discussed each of the impairments Claimant now advances.

### 1. Atrial Fibrillation

The ALJ acknowledged Claimant's 2012 atrial fibrillation diagnosis, pacemaker, and ongoing treatment for the condition, but found the condition was not disabling. (AR at 13.) The ALJ noted that a March 2015 transthoracic echocardiography report found some mild concentric left ventricular hypertrophy,[3] but generally normal size and function with no significant valvular abnormality. (*Id.* (citing AR at 567).) He also noted that a May 25, 2016 treatment note written by cardiologist Fayaz Hakim stated that Propafenone and aspirin "helped with this condition." (*Id.* (citing AR at 537 ("[T]he burden of her atrial fibrillation was decreased after increasing the dose of Papfenone."))). At that appointment, Dr. Hakim stated that Claimant's pacemaker was functioning normally, with atrial pacing 49-percent of the time. (*Id.*)

The ALJ also acknowledged that Claimant reported to the emergency room ("E.R.") for treatment of chest pain and a rapid heartbeat on August 1, 2016 and that she had episodes of fibrillation on October 1 and October 25, 2016. (*Id.*) On October 27, 2016, Dr. Hakim performed an atrial fibrillation ablation. (*Id.*) The ALJ stated that Dr. Hakim's follow-up records indicated that Claimant did "very well" after the procedure with no recurrences of atrial fibrillation. (*Id.* (citing AR 1427 (Dr. Hakim's November

---

[3] "Left ventricular hypertrophy is enlargement and thickening (hypertrophy) of the walls of [the] heart's main pumping chamber (left ventricle)." Mayo Clinic, Left ventricular hypertrophy, https://www.mayoclinic.org/diseases-conditions/left-ventricular-hypertrophy/symptoms-causes/syc-20374314.

13

21, 2016 treatment notes).)  The ALJ also stated Claimant subsequently presented to the E.R. in February 2017 for chest pain, but her pacemaker was functioning normally.  (*Id.* (citing AR at 1300-04).)  At that visit, Claimant attributed her chest pain "to a bit of an anxiety . . . that ensued after some argument with her daughter[;] she thinks the anxiety brought this on.  She took some alprazolam and that remedied quite a bit of her anxious feelings but she just want[ed] to get her heart checked out." (*Id.* at 1300.)  Claimant was released with a notation that her chest pain had resolved.  (*Id.* at 1304.)  Her EKG showed "normal sinus rhythm without acute changes of concern." (*Id.* at 1303.)

The ALJ concluded her step two analysis of Claimant's atrial fibrillation by stating that although the condition required regular treatment, including "one hospital procedure," the condition "did not cause more than minimal sustained limitations of a period lasting at least 12 months, nor is it expected to do so.  Therefore it is considered nonsevere." (*Id.* at 13.)

Claimant argues that "the existence of a pacemaker alone warrants reversal of the decision for further proceedings." (Doc. 17 at 1 (citing *Covington v. Astrue*, Civ. No. 11–2193, 2012 WL 4904386, at *3 (W.D. Ark. Oct. 15, 2012).)  First, contrary to Claimant's allegation, courts affirm ALJ decisions to deny benefits when claimants have pacemakers.  *See, e.g.*, *Blakeman v. Astrue*, 509 F.3d 878, 879, 883 (8th Cir. 2007); *Simmon v. Colvin*, Civil No. 13–3136 (DWF/JSM), 2015 WL 144812, at ** 1, 21 (D. Minn. Jan. 12, 2015). Second, the case at bar can be distinguished from *Covington*, in which the 21-year-old claimant had pacemakers implanted, fail, replaced, and cause problems since the age of three.  2012 WL 4904386, at *2.  *Covington* contains no facts about the claimant's activities, quality of life, or other abilities.  *Id.* at **2-3. Therefore, there is little in the case that allows for a proper factual comparison.  *Covington* remanded the case to develop the record regarding work-related limitations the claimant experienced due to her heart condition because the ALJ "failed to obtain medical testimony or advice,

via a consultative exam or contact with Plaintiff's treating cardiologist, regarding any limitations resulting from the fact that [the claimant had] a pacemaker." *Id.* at *3. *Covington* cited no precedent that stated the mere fact that a claimant has a pacemaker means that the claimant has a severe impairment. Thus, it appears that the decision to remand in *Covington* was limited to the unique facts of that case.[4] On the contrary, Claimant in the instant case provided the opinion of Dr. Lukken, who knew about her pacemaker. (AR at 2215, 2647-50.) In addition, the state agency consulting physicians understood that Claimant had a pacemaker when they rendered their opinions and narrated her history of cardiac procedures. (*Id.* at 88-89, 113-14.) Thus, remand is not required on that basis. Moreover, Claimant's medical history, including cardiac history, is well documented in the administrative record. However, it appears the claimant in *Covington* rarely saw a physician, except for two E.R. visits, after she turned 18, due to a lack of insurance. *Id.* at **2-3.

Claimant does not direct the Court to any specific medical evidence in the over 2600-page administrative record that demonstrates that the ALJ's conclusions are not supported by substantial evidence in the record as a whole. *See Singer v. Harris*, 897 F.3d 970, 980 (8th Cir. 2018) (holding that when plaintiff did not direct the court to a place in the record where it could find alleged errors, the court would only consider the arguments that were supported by appropriate citations) (citing *Manning v. Jones*, 875 F.3d 408, 410 (8th Cir. 2017)); *see also ASARCO, LLC v. Union Pac. R.R. Co.,* 762 F.3d 744, 753 (8th Cir. 2014) ("Judges are not like pigs, hunting for truffles buried in briefs or the record.") (noting internal quotation marks omitted); *Perrigo v. Colvin*, No.

---

[4] According to Westlaw, *Covington* has never been cited, which supports the theory that its holding was limited to the facts of the case.

12-CV-4102-DEO, 2014 WL 1234479, at *7 n.3 (N.D. Iowa Mar. 25, 2014) (same) (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)).

I have reviewed the ALJ's decision and the record and find the ALJ's decision supported by the record as a whole.

### 2. *Headaches*

The ALJ also specifically analyzed Claimant's headaches. "The claimant alleged pain and fatigue due to headaches (Ex. B9E at 6). [She] did require E.R. treatment for headaches and migraines at times during the period at issue. However, these usually resolved quickly." (AR at 13.) The ALJ cited treatment notes from a December 29, 2014 two-hour E.R. visit during for an "intermittent headache," during which the headache responded to medication and she was discharged. (AR at 594-95.) The ALJ also cited another treatment note for an E.R. visit where Claimant complained of swelling and "just feeling terrible . . . whatever you ask[,] I will have," including a headache, but admitted she had not taken analgesics for any of her pain. (*Id.* at 629.) Claimant was diagnosed with fluid retention and was released with a prescription for Trazadone hydrochloride tablets. (*Id.* at 630-31.) Claimant also went to the E.R. on December 30, 2016 complaining of a headache that was both 10/10 on the pain scale, but also "mild" in severity. (*Id.* at 1155.) Once again, Claimant did not try analgesics before going to the E.R. (*Id.*) Claimant was in no apparent distress, was noted to have low blood pressure, and her headache resolved and her blood pressure came up after she received IV fluids. (*Id.* at 1155-57.) Claimant again presented at the E.R. on January 1, 2017 with a mild headache after not trying analgesics for the pain. (*Id.* at 1206.) Once again, Claimant's headache resolved while she was at the hospital and she was discharged with Tramadol hydrochloride tablets. (*Id.* at 1207-08.)

Thus, Claimant's headaches always resolved with medication or other treatment. An impairment that is controlled with treatment or medication is not considered disabling.

16

*Brace v. Astrue*, 578 F.3d. 882, 885 (8th Cir. 2009) (citations omitted). Moreover, as indicated above, Claimant failed to treat her headaches at home before going to the E.R. In addition, Claimant was advised to treat her headaches with over-the-counter medications, such as Tylenol and Advil, which she testified work to resolve the headaches. (AR at 45.) Although Claimant argues that her headaches "mandate closer inspection than the ALJ performed in his analysis" (Doc. 17 at 2), she cites no evidence that contradicts the ALJ's findings. Therefore, the ALJ's decision is supported by the record as a whole.

### 3. *Asthma*

The ALJ also acknowledged Claimant's claim that she was disabled due to asthma. (*Id.* at 13.) The ALJ noted that Claimant presented to the E.R. for shortness of breath on February 10, 2015, which appeared secondary to bronchitis and an anxiety reaction and that Claimant breathed better after becoming calm. (*Id.* (citing AR 633).) The ALJ also stated that on March 19, 2017, Claimant had a pulse oximetry study that indicated that she qualified for nocturnal oxygen, but that there was no evidence of a severe cardiopulmonary impairment causing severe and/or persistent limitation even though Claimant continued to smoke cigarettes throughout the period at issue. (*Id.* at 13; *See also* AR 539, 1424, 2061 (treatment notes documenting Claimant's smoking in May 2016, January 2017, and August 2017).) In addition, the Commissioner noted, and my review of the records supports, Claimant did not seek any treatment for her asthma during the relevant time period, although Claimant apparently reports asthma when giving her health history to providers because it does appear in various "health condition" notations in the record. Claimant did not counter this argument in her reply brief. (Doc. 17.) "A lack of complaints to a treating physician detracts from a claimant's allegations of a disabling impairment." *Reece v. Colvin*, 834 F.3d 904, 909 (8th Cir. 2016) (citing *Fredrickson v. Barnhart*, 359 F.3d 972, 976 (8th Cir. 2004)).

Although Claimant also argues that her asthma "mandate[s] closer inspection than the ALJ performed in his analysis" (Doc. 17 at 2), she cites no evidence that contradicts the ALJ's findings. Therefore, the ALJ's decision on this issue is also supported by the record as a whole.

### 4. *Combination of Impairments*

Claimant asserts the following argument:

> [E]ven if the three conditions mentioned above are not severe impairments, there is no dispute in the record that they would limit her ability to maintain employment because they periodically require emergency treatment on an unscheduled basis. As the VE testified, those kinds of absences affect the ability to work. (R. 70). Therefore, reversal is warranted due to the ALJ's lack of consideration of these impairments in determining Plaintiff's residual functional capacity, regardless of whether or not they meet the 'severe impairment' guidelines.

(Doc. 17 at 2-3.)

First, there is little evidence that Claimant's impairments *required* E.R. treatment. Claimant chose to seek treatment at the E.R. It appears that Claimant never even tried treating her headaches at home before making that choice and testified that over-the-counter medication resolves her migraines. Most employers allow employees to take over-the-counter medication at work. Thus, this argument is without merit regarding her headaches. Claimant does not direct the Court to E.R. records stating that Claimant presented for atrial fibrillation that was not tied to anxiety and that was not resolved with alprazolam prior to presenting in the E.R.

Moreover, the ALJ considered the combined effects of all of Claimant's impairments, including her nonsevere impairments, when crafting her RFC. (AR at 11-12; *See also* 20 C.F.R. § 404.1545(a)(2).) Even if Claimant could prove the ALJ should have considered these impairments severe, remand is not required unless Claimant can also prove the ALJ's finding that these impairments were not severe caused her harm.

*See Wolaridge v. Colvin*, No. 2:14-CV-2074-MEF, 2015 WL 4073178, at *5 (W.D. Ark. July 6, 2015) ("[I]n order for Plaintiff to be entitled to a remand, the Plaintiff must not only prove that the ALJ should have considered other impairments as severe, rather she must also prove that the ALJ's failure to consider those impairments as severe caused harm.") (citing *Shinseki v. Sanders,* 129 S. Ct. 1696, 1706 (2009)).  Claimant has failed to do so.  Claimant does not indicate what limitations should have been added to her RFC had these impairments been found severe.  Therefore, since the ALJ discussed each of these impairments separately and cited to the record to support his conclusions and Claimant neither cites any evidence the ALJ failed to discuss nor explains how she was prejudiced by the way the ALJ weighed the evidence, the ALJ's decision on this issue is affirmed.

**B.    Whether the ALJ Correctly Considered Claimant's Impairments Under Listing 12.05(B)[5]**

Claimant argues that the ALJ's step three analysis, "focused on whether she had 'marked' limitations, and erred in finding that she suffered only moderate limitations with regard to interacting with others, remembering and/or applying information, and concentration, persistence, and pace." (Doc. 15 at 7.)  Claimant asserts that her lowest

---

[5] Claimant argued that the ALJ "failed to correctly consider her mental impairment when considering 12.05[(C)]." (Doc. 15 at 6.)  Listing 12.05(C) was no longer in effect when the ALJ decided Claimant's case on January 10, 2019 because the listings for mental disorders changed effective January 17, 2017. *See* 20 C.F.R. pt. 404, Subpt. P. appx. 1, § 12.00.  The version of the listing in effect at the time the ALJ rendered her decision governs the case. *See Burkhardt v. Berryhill*, No. 16-CV-2093-LTS, 2017 WL 9470631, at **6-7 (N.D. Iowa Apr. 3, 2017) (applying version of listing in effect at time of ALJ's decision), *R. & R. adopted*, 2017 WL 2829624 (N.D. Iowa June 30, 2017).  Thus, the Commissioner submits that listing 12.05(B) is the closest to the previous listing 12.00(C). (Doc. 16 at 14.)  Claimant does not dispute this assertion and has therefore waived any argument to the contrary. (Doc. 17 (Claimant's reply brief).)  Therefore, I will analyze Claimant's claims based on listing 12.05(B).

GAF score of 47 should have been weighted more heavily because "a score below 50 can mean that the claimant has a disabling condition (and thus, has 'marked' limitations for the purposed of the listing analysis)." (*Id.*) Claimant asserts that this low score resulted from more thorough testing than the higher GAF scores contained in the record. (*Id.* at 3.)

Claimant also argues that the ALJ erred in his analysis of her I.Q. score of 77. (Doc. 15 at 8.) Claimant relies, in part, on the SSA Program Operations Manual ("POMS"), which Claimant argues is persuasive authority that must be followed unless inconsistent with the relevant regulation or clearly erroneous, to support her arguments related to this issue. (*Id.*; Doc. 17 at 4 (quoting *Rhinehart v. Berryhill*, 2019 WL 2403971, at *7 (D.S.D. June 7 2019)).) Claimant also argues that her I.Q. score may, in fact, be as low as 73 based on the "confidence interval" used to interpret I.Q. test results. (*Id.* at 9.)

The Commissioner responds that Claimant only meets some of the 12.05(B) criteria, and therefore Claimant's argument has no merit. (Doc. 16 at 14.)

A claimant has the burden of establishing a severe impairment at step three. *Moore*, 572 F.3d at 523. Listing 12.05(B) requires a claimant to prove the following to establish a severe impairment.

12.05 Intellectual disorder satisfied by A or B:
    . . . .
B.  Satisfied by 1, 2, and 3:
   1. Significantly subaverage general intellectual functioning evidenced by a or b:
     a. A full scale (or comparable) IQ score of 70 or below on an individually administered standardized test of general intelligence; or
     b. A full scale (or comparable) IQ score of 71– 75 accompanied by a verbal or performance IQ score (or comparable part score) of 70 or

> below on an individually administered
> standardized test of general intelligence; and
>
> 2. Significant deficits in adaptive functioning currently
>    manifested by extreme limitation of one, or marked
>    limitation of two, of the following areas of mental
>    functioning:
>    a. Understand, remember, or apply
>       information; or
>    b. Interact with others; or
>    c. Concentrate, persist, or maintain pace; or
>    d. Adapt or manage oneself; and
>
> 3. The evidence about your current intellectual and adaptive
>    functioning and about the history of your disorder
>    demonstrates or supports the conclusion that the disorder
>    began prior to your attainment of age 22.

20 C.F.R. § 404, subpt. P, app. 1 § 12.05 Intellectual disorder satisfied by A or B (internal parenthetical cross-references omitted).

### 1. *Claimant's GAF Score of 47*

Claimant relies heavily on the GAF score of 47 assigned to her by consulting psychologist Denise Marandola, Ph.D., on December 17, 2014. (AR at 958.) Claimant argues, "As noted in various cases analysis [sic] GAF scores, a score below 50 can mean that the claimant has a disabling condition." (Doc. 15 at 7.) Claimant, however, has not cited *cases* to support this claim, instead citing only one nonbinding 2005 case from the Eastern District of Michigan.[6] This is not surprising because the latest version of

---

[6] A bit later in the brief, Claimant cites *Pate-Fires v. Astrue*, 564 F3d 935 (8th Cir. 2009) for the proposition that "the Eighth Circuit has noted the seriousness of a GAF score of 50." (Doc. 15 at 7.) *Juhl*, also cited by Claimant, succinctly summarized the relevant provisions of *Pate-Fires*:

> The ALJ in that case discredited a treating physician's opinion because a consultative examiner had assessed the claimant with a GAF score of 58. The court surveyed the GAF scores of record and observed that the ALJ had not

the *Diagnostic and Statistical Manual of Mental Disorders* has discontinued the use of GAF scores because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice." *Juhl v. Colvin*, No. C15-3093-LTS, 2016 WL 447619, at *6 (N.D. Iowa Feb. 4, 2016) (finding no error in ALJ's failure to take into account GAF scores) (quoting American Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 16 (5th ed. 2013) ("DSM-V")) (ellipses in original). *Juhl* also noted that "the Commissioner has declined to endorse GAF scores in disability analysis and has determined that GAF scores have no 'direct correlation' to disability adjudications." *Id.* (citing 65 Fed. Reg. 50746, 50764-65 (Aug. 21, 2000); *Jones v. Astrue*, 619 F.3d 963, 973-74 (8th Cir. 2010)). Moreover, the Eighth Circuit has declared, "GAF scores are of little value." *Nowling v. Colvin*, 813 F.3d 1110, 1123 (8th Cir. 2016). That being said, an ALJ should consider GAF scores along with all of the other medical evidence in the record. *Minney v. Berryhill*, No. 16-CV-00175-LTS, 2017 WL 2110767, at *10 (N.D. Iowa May 15, 2017), *R. &. R. adopted*, 2018 WL 659860 (N.D. Iowa Feb. 1, 2018) (citing SSR: Global Assessment of Functioning [GAF] Evidence in Adjudication, AM-13066-REV (Oct. 14, 2014) (title capitalization altered)).

On June 28, 2017, SSA issued a revised administrative message addressing, among other things, the assessment of GAF evidence in disability adjudications. *See*

discussed or considered the many GAF scores below 50. Indeed, the court noted that the claimant's GAF scores were above 50 only four out of twenty-one times over a six-year period. . . . The Eighth Circuit has held that GAF scores from 52 to 60 are consistent with a finding of no disability. *Wright v. Colvin*, 789 F.3d 847, 855 (8th Cir. 2015) (quoting *Halverson v. Astrue*, 600 F.3d 922, 931 (8th Cir. 2010)).

2016 WL 447619, at *6 n.2 (citations to the record omitted). The case at bar can be distinguished from *Pate-Fires* because the record contains only one GAF score below 50, rather than "many" scores below 50. Moreover, the low GAF score is an outlier.

*Supplemental ALJ Training* 31, https://www.ssa.gov/foia/resources/proactivedisclosure/2020/2017_Supplemental%20ALJ%20Training%20Notebook.pdf[7]. ALJs must still consider GAF ratings as evidence, however, "a GAF rating alone is never dispositive of impairment severity." *Id.* at 35. In addition, an adjudicator can never

> [e]quate any particular GAF rating with a listing-level limitation. The adjudicator cannot use a GAF rating to determine whether a claimant's impairment meets the diagnostic criteria of intellectual disorder in listing 12.05, because the rating lacks specificity, may not reflect a claimant's functioning over time, and is not a standardized measure of anything, including intelligence or adaptive behavior.

*Id.* at 36 (emphasis and internal numbering omitted). Thus, under both judicial precedent and SSA guidance, adjudicators cannot rely on a single GAF score when deciding if a claimant has a listed impairment.

Claimant was assigned three GAF scores of 62 by her therapist Katie Moir in October and November 2014, in addition to the GAF score assigned during her consultative examination. (AR at 506, 508, 510.) A treating therapist would normally have a better idea of a claimant's "functioning over time," than a consulting psychiatrist, even if, as in this case, the course of treatment lasted only a matter of months.

Moreover, the ALJ in the case at bar recited the above-quoted guidance on the use of GAF scores, noting that "a GAF score is merely a snapshot of an individual's functioning at a particular point in time and therefore should not be solely relied upon to determine the overall severity of an individual's mental impairments. . . . [T]he undersigned did not give any significant weight to the GAF scores included in the record. . . ." (AR at 25 (stated while crafting Claimant's RFC).)

---

[7] This link does not directly lead to the referenced source for some reason. An internet search, however, will lead to the source at this location.

Finally, Claimant's argument that a GAF score that is "the result of thorough testing and backed up by documentation of limitations [such as Dr. Marandola's], should be given a higher value," and the ALJ failed to give Dr. Marandola's GAF score higher weight than other GAF scores is without merit. (Doc. 17 at 3 (citing *Drummond v. Astrue*, 895 F. Supp. 2d 1117, 1131 (D. Kan. 2012)). *Drummond* evaluated GAF scores using the fourth edition of the DSM, which still endorsed GAF scores. 895 F. Supp. 2d at 1123 n.1. As discussed above, the fifth edition of the DSM abandoned GAF scores because of their lack of clarity. The ALJ was required to consider the GAF scores with all the other evidence in the record. The ALJ properly did so. (AR at 24.) It is also noteworthy that Dr. Marandola's consultative examination was not focused on work-related restrictions or activities, but rather resulted in therapeutic recommendations, including medication changes, increased social interaction, and beginning cognitive behavioral therapy. (*Id.* at 22, 959.)

Based on the above discussion, the ALJ properly explained his legitimate reasons for not assigning greater weight to the GAF score of 47.

### 2. Claimant's Full-Scale I.Q. Score of 77

Claimant also argues that the ALJ erred in his analysis of her I.Q. score. (Doc. 15 at 8-9.) As a result of her consulting examination, Dr. Marandola also assigned Claimant a full scale I.Q. score of 77. (AR at 956.) Dr. Marandola stated,

> This full scale IQ score[,] however, is not a good reflection of [Claimant's] overall ability as she demonstrated a significant difference between her Perceptual Reasoning Index (PRI) score as compared to her Verbal Comprehension (VCI) and Working Memory Index (WMI) scores. These differences indicate that she is much more adept at tasks that require perceptual reasoning and organization skills (Perceptual Reasoning) than she is at tasks that require reasoning, comprehension and conceptualization (Verbal Comprehension) and/or attention, concentration and working memory (Working Memory). She demonstrated a personal strength in the area of Visual Puzzles, suggesting very good nonverbal reasoning and the

ability to analyze and synthesize abstract visual stimuli. She demonstrated a personal weakness in the area of Matrix Reasoning, suggesting poor fluid intelligence, broad visual intelligence, classification and spatial ability, knowledge of part-whole relationships, simultaneous processing and perceptual organization.

(*Id.*)

Claimant asserts the ALJ should have "given more consideration to her borderline intellectual functioning in the listing analysis." (*Id.*) For support, Claimant cites POMS for determining medical equivalence for listing 12.05(C).[8] (Doc. 15 at 8-9.) Claimant was put on notice by the Commissioner's resistance that she was applying the incorrect listing in her arguments and chose not to adjust her arguments and base them on listing 12.05(B). In her reply brief, Claimant states that she relies on her opening brief in support of her I.Q.-related arguments and cites precedent related to the use of the POMS, in general, but does not offer an alternative POMS guideline related to listing 12.05(B) or another POMS guideline she argues would support her position regarding the use of her I.Q. test results. (Doc. 17 at 3-4.)

I will not apply POMS guidelines for listing 12.05(C) in this case because listing 12.05(C) was not in effect at the time the ALJ decided Claimant's case. Therefore, it is not a reasonable guideline against which to measure the ALJ's decision. However, I will

---

[8] POMs 12.05(C) provides the following:

Listing 12.05C is based on a combination of an IQ score with an additional and significant mental or physical impairment. The criteria for this paragraph are such that a medical equivalence determination would very rarely be required. However, slightly higher IQ's (e.g., 70-75) in the presence of other physical or mental disorders that impose additional and significant work-related limitation of function may support an equivalence determination. It should be noted that generally the higher the IQ, the less likely medical equivalence in combination with another physical or mental impairment(s) can be found.

http://pomsresource.org/poms/DI-24515.056/specific-medical-evaluation-instructions.

look at POMS 12.05(B) to see if it provides guidance. POMS 12.05(B) provides, "Listing 12.05B introduces IQ scoring as a criterion and presents an impairment level in which inability to work is presumed on the basis of IQ scores alone." http://pomsresource.org/poms/DI-24515.056/specific-medical-evaluation-instructions.

Thus, while POMS 12.05(C) provides for determining medical equivalence by balancing a range of I.Q. scores and a claimant's other physical and mental disorders, POMS 12.05(B) is clear that disability can be presumed on the basis of I.Q. scores alone, assuming, of course, that the other criteria of 12.05(B) are satisfied. No provision is made for determining medical equivalence (or I.Q. equivalence) by balancing higher or lower I.Q. scores with other physical and mental disorders. *Id.* Thus, while the appropriate POMS provide some guidance on the issue, the guidance is different from the guidance provided in the 12.05(C) POMS.

Claimant next argues that the POMS are binding on the Court. (Doc. 17 at 4.) The Commissioner responds that while the POMS must be considered, they are not binding on the Commissioner. (Doc. 16 at 19.)

"As an interpretation of a regulation promulgated by the Commissioner, the POMS control unless they are inconsistent with the regulation or plainly erroneous." *Rodysill v. Colvin*, 745 F.3d 947, 950 (8th Cir. 2014) (citations omitted). Although POMS guidelines "do not have legal force, and do not bind the Commissioner, . . an ALJ should consider the POMS guidelines." *Shontos v. Barnhart*, 328 F.3d 418, 424 (8th Cir. 2003) (citing *Berger v. Apfel,* 200 F.3d 1157, 1161 (8th Cir. 2000)); *List v. Apfel,* 169 F.3d 1148, 1150 (8th Cir. 1999)). In this case, it would be plainly erroneous to apply the 12.05(C) POMS and the ALJ did not do so. It is also apparent the ALJ applied POMS guidance for 12.05(B), which is not inconsistent with listing 12.05(B), when he did not presume Claimant met list 12.05(B) on the basis of Claimant's I.Q. score, alone. (AR at 16-17 ("[T]hese requirements were not met because the claimant's full scale IQ of 77.

. . is not low enough to fall within the criteria necessary to meet listing 12.05B.").)
Moreover, since the POMS do not bind the Commissioner, the ALJ's failure to cite them
was understandable.  To the extent Claimant is arguing the ALJ should have cited the
POMS, "the ALJ's arguable deficiency in opinion-writing technique [on this issue] had
no bearing on the outcome of [the] case and does not require remand." *Buckner v.
Astrue*, 646 F.3d 549, 560 (8th Cir. 2011) (internal quotation omitted).

Claimant argues that the Commissioner "does not argue that the part of the POMS
. . . referenced by Plaintiff in her argument is either inconsistent with the regulation or
plainly erroneous, so it is controlling." (Doc. 17 at 4.)  Claimant misconstrues the
Commissioner's argument that listing 12.05(C) was not in effect on January 10, 2019
because the Commissioner's listings for mental disorders changed effective January 17,
2017. (Doc. 16 at 14 n.4, 19 n.6.)  I interpret the Commissioner's argument as an
argument that POMS 12.05(C) is irrelevant to, and inconsistent with, the relevant listing.
To the extent POMS 12.05(C) was consistent with listing 12.05(C), that issue is moot
because listing 12.05(C) does not apply to Claimant's case.

Claimant's main argument, however, is that her I.Q. score of 77 is "barely above
the 71-75 range discussed in the listing," and "when the low end of [her] scores (the
confidence interval) is considered, there is a significant probability that her IQ is below
75." (Doc. 15 at 8.)  The "confidence interval" Claimant refers to is something Dr.
Marandola calculated in her report.

> Verbal Comprehension Index Score = 76; Confidence Interval = 71-83
> Perceptual Reasoning Index Score = 88; Confidence Interval = 82-95
> Working Memory Index Score = 77; Confidence Interval = 72-85
> Processing Speed Index Score = 84; Confidence Interval = 77-94
> Full-Scale IQ Score = 77; Confidence Interval = 73-82
>      At the 95% Confidence Level

(AR at 956.)

27

> A "confidence interval" is used to indicate the reliability of a point estimate of a parameter. The confidence interval is a range of values above and below a point estimate and within which the parameter is estimated to lie. The confidence interval is qualified by a confidence level, generally expressed as an estimate. A 95% confident interval means that the investigator is 95% confident that the true estimate lies within the confidence level. *See* Wikipedia, Confidence interval, at http://en.Wikipedia.org/wiki/Confidence_interval; United States National Library of Medicine – National Institutes of Health, National Information Center on Health Services Research and Health Care Technology, Health Technology Assessment101: Glossary, at http://www.nim.nih.gov/nichsr/hta101/ta101014.html.

*Evanoff v. Berryhill*, No. 2:17 CV 41 JMB, 2018 WL 4489362, at *6 n.4 (E.D. Mo. Sept. 19, 2018).

According to Claimant, her true full scale I.Q. could be as low as 73 and the ALJ's failure to consider POMS 12.05 should lead to reversal and remand because the record does not support the ALJ's conclusion that Claimant does not have marked limitations caused by severe mental health impairments. (Doc. 15 at 9.) Claimant cites no treatment notes or other records that the ALJ failed to discuss or that the ALJ failed to give proper weight and cites no other evidence that supports her contentions.

The ALJ correctly found that Claimant's full scale I.Q. score was not low enough to fall within the criteria necessary to meet listing 12.05(B), which requires a "[a] full scale (or comparable) IQ score of 71-75 accompanied by a verbal or performance IQ score of 70 or below" and significant limitations in one or marked limitations in two area of mental functioning. (AR at 16.) Moreover, the ALJ noted Dr. Marandola's caveat that the score was not a good reflection of Claimant's overall functioning because her other scores indicated that Claimant is much more adept at tasks requiring perceptual reasoning and organizational skills than she is at tasks requiring reasoning, comprehension, and conceptualization and/or attention, concentration and working

memory. (AR at 17.) Even if I were to accept 73 as Claimant's I.Q. score, something for which there is no support, the listing also requires that the score be "accompanied by a verbal or performance IQ score (or comparable part score) of 70 or below on an individually administered standardized test of general intelligence." 20 C.F.R. § 404, subpt. P, app. 1 § 12.05(B)(1)(b). Claimant does not direct the Court to this score. Claimant's I.Q. verbal comprehension index score was 76, with a confidence interval of 71-83. (AR at 956.) All of the other individual index scores are higher. (*Id.*)

Beyond establishing her impairment equaled a listed impairment by looking at the language of listing 12.05(B), Claimant seems to be arguing that her borderline intellectual functioning/learning disorder is the "medical equivalent" of listing 12.05(B). There are three ways a claimant can prove her impairment equals a listed impairment:

(1)(i) If [the claimant] ha[s] an impairment that is described in [the listings], but—

    (A)   [The claimant] do[es] not exhibit one or more of the findings specified in the particular listing, or

    (B)   [The claimant] exhibit[s] all of the findings, but one or more of the findings is not as severe as specified in the particular listing,

(ii)   [The Social Security Administration] will find that [the claimant's] impairment is medically equivalent to that listing if [the claimant] ha[s] other findings related to [the] impairment that are at least of equal medical significance to the required criteria.

(2)   If [the claimant] ha[s] an impairment(s) that is not described in [the listings], [the Social Security Administration] will compare [the claimant's] findings with those for closely analogous listed impairments. If the findings related to [the claimant's] impairment(s) are at least of equal medical significance to those of a listed impairment, [the Social Security Administration]

> > will find that [the claimant's] impairment(s) is
> > medically equivalent to the analogous listing.
>
> > (3) If [the claimant] ha[s] a combination of impairments,
> > no one of which meets a listing, [the Social Security
> > Administration] will compare [the claimant's] findings
> > with those for closely analogous listed impairments. If
> > the findings related to [the claimant's] impairments are
> > at least of equal medical significance to those of a listed
> > impairment, [the Social Security Administration] will
> > find that [the claimant's] combination of impairments
> > is medically equivalent to that listing.
>
> 20 C.F.R. §§ 404.1526(b), 416.926(b). "To prove that an impairment or
> combination of impairments equals a listing, a claimant 'must present
> medical findings equal in severity to *all* the criteria for the one most similar
> listed impairment.'" *KKC ex rel. Stoner v. Colvin*, 818 F.3d 364, 370 (8th
> Cir. 2016) (quoting *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990)).

*Allaire v. Comm'r of Soc. Sec.*, No. 18-CV-60-LRR-KEM, 2019 WL 5579549, at *3 (N.D. Iowa July 18, 2019) (alterations in original), *R. & R. adopted as modified on other grounds*, 409 F. Supp. 3d 698 (N.D. Iowa 2019). Thus, SSA provides claimants several paths for establishing medical equivalency. However, in all cases, claimants must still support their claims with medical findings. As stated previously, Claimant provides no citations to evidence in the record to support her arguments. Therefore, Claimant has not "present[ed] medical findings equal in severity to *all* the criteria for the one most similar listed impairment" and therefore has not satisfied her burden at step three.

Based on the above discussion, the ALJ properly explained his legitimate reasons for finding that Claimant's full scale I.Q. score of 77 did not meet the criteria necessary to find Claimant disabled under listing 12.05(B).

### 3. Other Support for the ALJ's Contested Step Three Findings

Although Claimant focuses on two pieces of evidence, substantial evidence in the record as a whole supports the ALJ's step three findings that Claimant had moderate

limitations in the areas of which Claimant now complains: (1) understanding, remembering and applying information; (2) interacting with others; and (3) concentrating, persisting, or maintaining pace. (AR at 14-15.) Claimant cites no evidence that undermines these ALJ's findings, stating only that the "ALJ's analysis focused on whether she had 'marked' limitations, and erred in finding that she suffered only moderate limitations with regard to interacting with others, remembering and/or applying information, and concentration, persistence, and pace." (Doc. 15 at 7.) *See Singer*, 897 F.3d at 980 (court would only consider arguments that were supported by appropriate citations).

### a. *Limitations in Understanding, Remembering, or Applying Information*

The ALJ found Claimant had moderate limitations in understanding, remembering, or applying information. (AR at 14.) In addition to relying on Claimant's I.Q. score and Dr. Marandola's explanation of the score, the ALJ also relied on Dr. Tony Larson's December 12, 2016 second consulting psychological examination of Claimant. (*Id.* (citing AR at 969-75).) Claimant told Dr. Larson that she could drive, obtain her own medical care, prepare meals as complex as lasagna, participate in housekeeping and laundry chores, and groom herself to an adequate level. (*Id.* at 970.) In spite of Claimant also saying she needed help taking medications and managing finances and that she cannot help with child care, Dr. Larson found Claimant's overall level of independent functioning to be fair. (*Id.*) Claimant's thoughts were lucid and goal-directed; her mood and affect were appropriate; she was alert and oriented to time, place and situation; and although her concentration and memory appeared somewhat impaired, she was able to stay on topic. (*Id.*) Thus, while Dr. Larson noted that Claimant had several diagnoses,[9]

---

[9] Dr. Larson diagnosed Claimant with the following impairments:

and stated that although Claimant's anxiety and ADHD symptoms were the most-likely of her diagnoses "to be problematic" in the workplace, he concluded that Claimant "should be able to understand and carry out instructions, interact appropriately with others, exercise proper judgment, and remain flexible in the workplace." (*Id.* at 973.) Thus, this conclusion is supported.

### b. *Limitations on Interacting with Others*

The ALJ found Claimant had moderate limitations in interacting with others. (AR at 15.) The ALJ acknowledged that at her first consultative examination with Dr. Marandola, Claimant alleged nightmares and flashbacks due to PTSD, "blackout anger," and threatening suicide. (*Id.* (citing AR at 953-59).) The ALJ noted that in spite of this, Claimant was able to interact appropriately during that examination, appeared "friendly and cooperative, and was appropriately groomed" for her second consultative examination with Dr. Larson. (*Id.*; 955, 970.) Dr. Larson also noted that Claimant would be able to interact with supervisors, coworkers, and the public. (*Id.* at 971.) This conclusion was properly supported.

---

- Major Depressive Disorder, Recurrent Episode, Moderate
- Attention-Deficit/Hyperactivity Disorder, Predominately Inattentive Presentation, Moderate
- Panic Disorder
- Generalized Anxiety Disorder
- Posttraumatic Stress Disorder
- Specific Learning Disorder with Impairment in Reading (by client report)
- Specific Learning Disorder with Impairment in Written Expression (by client report)
- Specific Learning Disorder with Impairment in Mathematics (by client report)
- Other Specified Bipolar and Related Disorder

(AR at 973 (DSM diagnostic classification numbers omitted; bullet points added).)

32

### c.    Limitations on Concentrating, Persisting, or Maintaining Pace

The ALJ found Claimant had moderate limitations in concentrating, persisting, or maintaining pace. (AR at 15.)  The ALJ stated that in her application, Claimant alleged disability based, in part, on ADHD and anxiety and stated that she was unable to handle written or spoken instructions well.  (*Id.* (citing AR at 231, 297).)  The ALJ also noted that although Claimant "displayed weakness in matrix reasoning, suggesting poor fluid intelligence, broad visual intelligence, classification and spatial ability, knowledge of part-whole relationships, simultaneous processing and perceptual organization" at her first consultative examination, "she was generally able to complete all tasks asked of her."  (*Id.* (citing AR at 953-59).)  In addition, the ALJ stated that while Claimant's memory was "somewhat impaired" and she had "issues with attention and calculation" during her second consultative examination, Claimant "was able to stay on topic and there was no evidence of a severe cognitive impairment."  (*Id.* (citing AR 969-74).)

These conclusions are also supported by the conclusions of state agency consulting psychologist Dee Wright, Ph.D., who opined on December 21, 2016 that while Claimant would have "difficulty performing complex cognitive tasks that demanded prolonged attention to minute complex details, rapid shifts in alternating attention, and high levels of abstract reasoning," Claimant "can sustain sufficient concentration/attention and memory function to perform noncomplex, repetitive, and routine cognitive tasks requiring one to two step instructions without significant limitations of function."  (*Id.* at 84.)  On reconsideration, Aidaluz Tirado, Phys.D., affirmed Dr. Wright's decision, noting that Claimant rarely takes Alprazolam for anxiety and drives, shops in stores, and pays bills.  (*Id.* at 108.)

### 4.    Conclusion

The ALJ properly considered Claimant's impairments under listing 12.05(B) and his decisions on these issues are affirmed.

*C.*     ***Whether the ALJ Provided Good Reasons for the Weight Afforded Dr. Lukken's Opinion***

Claimant takes issue with the weight the ALJ assigned to the opinion of her treating physician, Dr. Wade Lukken.[10]  (Doc. 15 at 10.)

On May 16, 2018, Dr. Lukken answered four questions presented to him in a letter from Claimant's attorney.  (AR at 2647-48.)  The answers to these four questions constitute Dr. Lukken's opinion in this case.

1.  What conditions have you treated Ms. Berke for? What is the prognosis for these conditions?
    Lumbar spondylosis and neurogenic claudication.[11]  These conditions are chronic and have not responded to interventional treatment.

2.  With her conditions, do you believe that it is likely that she would be required to take frequent unscheduled breaks during a regular work day?
    Yes.

3.  With her conditions, do you believe that it is likely that she would miss more than two days of work per month on an unscheduled basis?
    Yes.

4.  Do you believe that Ms. Berke is an appropriate candidate for social security disability benefits?
    Unfortunately, I do not have enough knowledge of the requirements of Social Security disability benefits to give an opinion.

(*Id.* at 2647.)

_____

[10] Claimant relates this to the ALJ's "Step Five Error" in presenting hypotheticals to the VE. (Doc. 15 at 10-11.)  However, because this is a potential threshold issue as to whether the ALJ's hypotheticals were appropriate, I am discussing it separately.

[11] "Neurogenic claudication results from compression of the spinal nerves in the lumbar (lower) spine. It is sometimes known as pseudoclaudication."  The Spine Hospital at the Neurological Institute of New York, Neurogenic Claudication, Summary, https://www.columbiaspine.org/condition/neurogenic-claudication/.

The ALJ assigned "little weight" to Dr. Lukken's opinion. (AR at 23-24.) The ALJ reasoned that "[a]lthough the claimant has chronic lumbar issues, the evidence summarized above, including radiological results and examinations, do support the claimant's ability to work at the light level." (*Id.* at 24.)

### 1. Legal Standard for Evaluating Dr. Lukken's Opinion

"It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians." *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007) (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001) (noting internal citations omitted)). An ALJ must "give good reasons" for the weight given to a treating physician's opinion. 20 C.F.R. § 404.1527(c)(2). "A treating physician's opinion is given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record as a whole.[12] *Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010) (quotation omitted). "Even if the treating physician's opinion is not entitled to controlling weight, it should not ordinarily be disregarded and is entitled to substantial weight." *Papesh v. Colvin*, 786 F.3d 1126, 1132 (8th Cir. 2015) (citation and brackets omitted). However, a treating physician's opinion can be given limited weight if it contains only conclusory statements, contains inconsistent opinions "that undermine the credibility of such opinions," is inconsistent with the record, or if other medical opinions are supported by "better or more thorough medical evidence." *Id.* (citations omitted). A treating physician's opinion that is "not supported by diagnoses based on objective evidence" will not support a finding of disability. *Edwards v. Barnhart,* 314 F.3d 964,

---

[12] Under current regulations, a treating physician's opinion is entitled to no special deference. *See* 20 C.F.R. § 404.1520c(c). These regulations were effective as of March 27, 2017. *See* 20 C.F.R. § 404.1527. However, Claimant's claims were filed on September 27, 2016. Thus, the old regulations apply. *See id.*

967 (8th Cir. 2003) (citing *Bates v. Chater,* 54 F.3d 529, 532 (8th Cir. 1995)). If the opinion is "inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight." *Id.* (citation omitted).

When a treating physician's medical opinion is not given controlling weight, the following factors will be examined to determine the weight to give the opinion: (1) length of the treatment relationship and the frequency of examination, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors. 20 C.F.R. § 404.1527(c)(2).

### 2. *Analysis*

#### a. *Length and Frequency of Treatment Relationship*

"When the treating source has seen [the claimant] a number of times and long enough to have obtained a longitudinal picture of [the claimant's] impairment, [the ALJ] will give the medical source's opinion more weight than . . . if it were from a nontreating source." 20 C.F.R. § 404.1527(c)(2)(i). In his opinion, Dr. Lukken does not say how long he has treated Claimant. After a review of the record, it appears that Dr. Lukken first treated Claimant on December 16, 2014 and treated her seven times between then and the end of the relevant time period. (AR 518-34 (December 16, 30, and 31, 2014; February 11, May 29, and July 8, 2015); 2151-54 (April 3, 2017).) Therefore, this factor weighs in favor of giving the opinion more weight.

#### b. *Nature and Extent of Treatment Relationship*

"Generally, the more knowledge a treating source has about [a claimant's] impairment(s), the more weight [the ALJ] will give to the source's medical opinion." 20 C.F.R. § 404.1527(c)(2)(ii). Dr. Lukken treats Claimant for lumbar spondylosis and neurogenic claudication that are relevant to the ALJ's finding that Claimant's lumbar

degenerative disc disease was a severe impairment.[13]  Therefore, this factor weighs in favor of giving the opinion more weight.

### c.    *Supportability*

"The better an explanation a source provides for a medical opinion, the more weight [the ALJ] will give that medical opinion."  20 C.F.R. § 404.1527(c)(3).  "A treating physician's own inconsistency may . . . undermine his opinion and diminish or eliminate the weight given his opinions."  *Hacker*, 459 F.3d at 937.  "A treating physician's opinion deserves no greater respect than any other physician's opinion when the treating physician's opinion consists of nothing more than vague, conclusory statements." *Piepgras v. Chater*, 76 F.3d 233, 236 (8th Cir.1996); *Thomas v. Berryhill*, 881 F.3d 672, 675 (8th Cir. 2018) ("[Dr. Hollis's] assessments, however, consist of nothing more than vague, conclusory statements—checked boxes, circled answers, and brief fill-in-the-blank responses. They cite no medical evidence and provide little to no elaboration, and so they possess little evidentiary value. On that basis alone, the ALJ did not err in giving Dr. Hollis's RFC assessments little weight and relying more heavily on other opinions in the record.") (internal quotations and citations omitted). Therefore, a treating source's opinion can be given limited weight if it contains only conclusory statements or inconsistent opinions "that undermine the credibility of such opinions." *Papesh*, 786 F.3d at 1132 (quotation omitted).

Claimant argues that Dr. Lukken does not have time to write a detailed opinion, so his conclusions "should be judged on his treatment of [Claimant], not on the quality of the [opinion] itself."  (Doc. 17 at 4.)  Claimant further asserts that Dr. Lukken's opinions were not "vague (e.g., simply stating that the Plaintiff was 'disabled') but were specific in terms of the responses provided to the questions asked [in the letter]."  (*Id.* at

---

[13] Claimant did not base her disability claim on back problems. (AR at 231.)

5.)  She also argues that the VE testified that "either excessive absenteeism or frequent breaks would render [Claimant] unemployable."  (Doc. 15 at 10.)  Claimant cites no treatment notes to support her request to base my judgement on Dr. Lukken's "treatment of Claimant" rather than his opinion.  Thus, Claimant fails to identify what "treatment" she wants me to focus upon.

I do not find Claimant's attempt to downplay the barebones nature of Dr. Lukken's opinion to be persuasive.  Adjudicators are required to assess treating physician's opinions.  20 C.F.R. § 404.1527(c)(2); *Wagner*, 499 F.3d at 848; *Piepgras*, 76 F.3d at 236.  Thus, I must evaluate the opinion Claimant presented to the Court.  Claimant was represented by counsel prior to her administrative hearing.  Indeed, Claimant's counsel sent the letter/opinion in question to Dr. Lukken and could have sent the letter back asking Dr. Lukken to expound on his answers.  The instructions in the letter did not confine Dr. Lukken to yes/no answers.  Rather, the instructions told Dr. Lukken to "address the following questions."  (AR at 2647.)  At this juncture, however, I cannot assume what Claimant implies Dr. Lukken wanted to say in his opinion.

That being said, I am required to determine if Dr. Lukken's treatment notes support the statements he made in his opinion.  To the argument that the opinion is not vague, I do not find the opinion vague.  Rather, I find it cursory and unsupported by citation to any treatment notes or by anecdotal evidence from Dr. Lukken's own experiences with Claimant.

On December 16, 2014, Claimant saw Dr. Lukken for the first time for bilateral low back pain and "very fleeting" numbness in her legs.  (AR at 518.)  Although sacral compression and sacral thrust tests were negative and musculoskeletal strength and sensation in the lower extremities was grossly intact, examination elicited pain with palpitation over her facet joints.  (*Id.* at 519.)  Therefore, Dr. Lukken decided to proceed with lidocaine injections.  (*Id.* at 519-22.)  After injections, Claimant's pre-existing pain

38

was reduced by 80-percent. (*Id.* at 524.) On December 31, 2014, Dr. Lukken performed radiofrequency ablation of the medial branch nerves. (*Id.* at 525-26.) On February 11, 2015, Claimant reported to Dr. Lukken that per pain had not been improved by the ablation, something Dr. Lukken said should have occurred by six weeks post-procedure. (*Id.* at 527.) At this appointment, Claimant did not appear uncomfortable or in any acute distress, although Dr. Lukken elicited "significant discomfort" with manipulation and palpation and "loading" of the facet joints. (*Id.* at 528.) Dr. Lukken ordered a CT of Claimant's lumbar spine and added Melaxicam to her medication regime. (*Id.*) On May 29, 2015, Dr. Lukken noted that the CT scan revealed a bulging disc at L5-S1. (*Id.* at 529.) Dr. Lukken stated Claimant had "a fairly classic presentation of spinal stenosis[. I]f she walks for any extended period or as soon as she stands she has significant bilateral low back pain. As soon as she sits and rests the pain goes away. (*Id.*) Dr. Lukken performed an epidural steroid injection and Claimant reported no pain after injection. (*Id.* at 531-32.) On July 8, 2015, Claimant returned to Dr. Lukken complaining that she did not have long-lasting relief from the May injection. (*Id.* at 533.) Claimant complained of increased weakness from prolonged walking, but that "her back pain and leg pain . . . decreases significantly when she stops and rests." (*Id.*) Claimant did not appear uncomfortable and was not in any acute distress. (*Id.* at 534.) He diagnosed her with lumbar radiculopathy.[14] Dr. Lukken referred Claimant to Dr. Espiritu for a surgical opinion. (*Id.*)

Claimant returned to Dr. Lukken in April 2017 for the first time in approximately two-and-a-half-years on a referral from ARNP Kelly Bean "after a lumbar spine CT indicated 'no worrisome change' compared to the prior study, with sclerotic facet joints

---

[14] Radiculopathy is a "disorder of the spinal nerve roots." *Stedman's Medical Dictionary* 1622 (28th ed. 2006).

but otherwise normal findings." (AR at 20, 1353, 2050.) Claimant told Dr. Lukken that Dr. Espiritu found she was not a candidate for surgery. (AR at 2151.) Claimant complained of chronic pain that was made worse by lying down, standing, sitting, walking, exercising, coughing/sneezing, bending, lifting, arising from a chair, heat, ice, movement, position changes, turning, and upright activity. (*Id.*) In spite of this, Dr. Lukken's objective examination revealed Claimant did not appear to be uncomfortable during her appointment and was in no acute distress, although she claimed her pain was currently 10/10. (*Id.* 2151, 2153.) Although Dr. Lukken found "what seemed to be facet mediated pain and possibly some myofascial pain the lower lumbar facet area," Claimant's cervical and lumbar spine both had normal motion and Claimant had normal gait and stance with no antalgic gait. (*Id.* at 2153.) Dr. Lukken noted that Claimant had not responded to radiofrequency ablation, prescribed morphine sulfate and hydrocodone-acetaminophen, and counseled Claimant on smoking cessation. (*Id.* at 2153-54.)

These treatment notes support the ALJ's decision to give Dr. Lukken's opinion little weight. Although Dr. Lukken diagnosed Claimant with various lower back problems throughout the years (lumbar radiculopathy, spinal stenosis, spondylosis and neurogenic claudication), Claimant was never uncomfortable or in distress during her appointments with him, in spite of stating at her April 2017 appointment that every possible physical movement or position caused pain. Claimant had normal lumbar movement, gait, and stance upon examination. Dr. Lukken noted more than once that pain Claimant experienced while walking was relieved when she sat or stopped walking. However, this does not necessarily translate into a need for frequent breaks beyond those usually scheduled in a work day. Dr. Lukken acknowledged this when he stated that he did not know about the requirements for Social Security benefits. In addition, there is no support in the treatment notes for the assertion the Claimant would miss two-or-more-days-of-work-per-month. The treatment notes say nothing about Claimant missing appointments,

events, or even regular shopping trips due to her symptoms. Likewise, Dr. Lukken does not provide any support for these statements (or "yes" answers) in his opinion and therefore, the opinion cannot provide a basis for determining disability. *See Teague v. Astrue*, 638 F.3d 611, 615 (8th Cir. 2011).

While the ALJ found Claimant's degenerative disc disease to be a severe impairment, Claimant's RFC is what the claimant can still do despite her limitations. *Guilliams*, 393 F.3d at 801. Likewise, while Dr. Lukken's treatment notes show that Claimant has back impairments, they also show she is capable of doing more than Dr. Lukken states she is able to do in his opinion. This lack of corroboration from Claimant's back specialist is notable because Claimant did not apply for disability based on back problems. Claimant's lack of alleged disability based on back problems and pain is "significant," even if evidence of back problems was later developed in the record. *See Dunahoo v. Apfel*, 241 F.3d 1033, 1039 (8th Cir. 2001) (citing *Smith v. Shalala,* 987 F.2d 1371, 1375 (8th Cir. 1993)).

This factor weighs against giving the opinion more weight.

### d. *Consistency*

"Generally, the more consistent a medical opinion is with the record as a whole, the more weight [the ALJ] will give to that medical opinion." 20 C.F.R. § 404.1527(c)(4). The ALJ found that "the evidence summarized above, including the radiological results and examinations, do support the claimant's ability to work at the light level." (AR at 24.) The summarized evidence to which Claimant referred includes Dr. Gregory Olson's treatment notes, Dr. Lukken's treatment notes, Dr. Michael T. Espiritu's treatment notes, Dr. Robert Wisco's treatment notes, ARNP Kelly Bean's treatment notes, Claimant's hearing testimony, Claimant's daughter's hearing testimony, Claimant's application materials, and the opinions of the state agency consulting physicians. (*Id.* at 21-24.)

41

Claimant asserts that the ALJ "merely stated that the radiological examinations did not support [Dr. Lukken's] conclusions," and that because the record establishes that Dr. Lukken treated Claimant "for a long period of time, and thus had the firsthand opportunity to observe [Claimant's] pain and resulting limitations, the "the bare mention of radiological examinations without more, did not satisfy the ALJ's obligation to give 'specific, legitimate reasons for disregarding a treating physician's opinion.'" (*Id.* (citing *Lopez v. Astrue*, 805 F. Supp. 2d 1081, 1086 (D. Colo. 2011).)

Claimant misreads the ALJ's decision. The ALJ referred not only to "radiological results and examinations," but also to treatment notes and other evidence that took pages to discuss. Therefore, this argument is without merit.

Claimant also argues that a treating physician's opinion is entitled to great weight because a treating physician has "the best opportunity to observe and evaluate a claimant's condition." (Doc. 15 at 10 (citing *Laver v. Apfel*, 245 F.3d 700, 705 8th Cir. 2001; *Johnson v. Callahan*, 968 F. Supp. 449, 460 (N.D. Iowa 1997)). Claimant cites a Southern District of Ohio case for "a good illustration of the significance of a longtime treating doctor's report." (Doc. 17 at 4-5.) The cited part of the case, *Lewis-Money v. Comm'r of Soc. Sec.*, merely states the same rules applied in the Eighth Circuit. 142 F. Supp. 3d 631, 639 (S.D. Ohio 2015). The case explains why deference is given to treating sources' opinions that are well-supported by "medically acceptable evidence and [that are] not inconsistent with other evidence in the record." *Id.*

Under the rules that govern this case, a treating physician's opinion is entitled to great weight, *but only* if that opinion is well explained and well supported by medical evidence. *See Papesh*, 786 F.3d at 1132 (emphasis added). A treating physician's opinion can be given limited weight if it contains only conclusory statements or if other medical opinions are supported by "better or more thorough medical evidence." *Id.* A

treating physician's opinion that is "not supported by diagnoses based on objective evidence" will not support a finding of disability. *Edwards,* 314 F.3d at 967.

Although Claimant does not take issue with any evidence cited by the ALJ, and cites no evidence that contradicts the evidence cited by the ALJ, I will still analyze the ALJ's decision to determine if it is, indeed, supported by the record as a whole.

Claimant alleged disability based on a number of conditions, not including back problems. (AR at 231.) However, the ALJ noted that in her first function report, Claimant first described pain and pressure in her low back that could last for hours-a-day or all day and that was relieved by rest and lying down. (*Id.* at 17, 265-66.) Claimant stated she could only walk to her front door or vehicle. (*Id.* at 17, 256.) The ALJ also cited Claimant's second function report, in which Claimant stated she cooked simple meals, sometimes on a daily basis. (*Id.* at 17, 267.) Claimant stated that she had to sit while she cooked, and that was difficult because she is short. (*Id.*) Claimant stated that back pain made it difficult to stand too long or bend over when she was getting dressed. (*Id.* at 266.) However, she tried to help take care of her dogs and to do as much housework as she could. (*Id.*) The ALJ also noted that Claimant drove and shopped for necessities. (*Id.*) Claimant shopped every week for "an hour or so," and used a motorized scooter in the store. (*Id.* at 268.)

The ALJ stated that Claimant saw Gregory Olson, D.O., on September 26, 2014 for a backache she had had for two weeks. Claimant told Dr. Olson she had received cortisone injections at the Mayo Clinic the previous year, but they did not help her pain and was told if they did not work, Mayo doctors recommended a rhizotomy. (AR at 743, 747.) Dr. Olson discussed weight loss with Claimant, prescribed muscle relaxants, and hydrocodone-acetaminophen. (*Id.* at 746.) Dr. Olson waited on further recommendations until he could see records from the Mayo. (*Id.* at 747.)

43

Claimant saw Dr. Espiritu on July 14, 2015. (*Id.* at 815-18.) On examination, Claimant's gait was normal, she could stand on both her toes and her heels,[15] experienced no pain with internal and external rotation, but had decreased lumbar flexion and extension. (*Id.* at 817.) Claimant had "some diffuse tenderness" to palpation of her "paraspinal muscles, lumbar and thoracic, as well as into the buttock region, with no tenderness over the greater trochanteric bursa." (*Id.*) Claimant's straight leg raise and contralateral straight leg raise testing produced only some pulling in her back without any true radicular symptoms. (*Id.*) Based on her examination, x-rays, and a CT scan, Dr. Espiritu diagnosed Claimant with some degenerative changes, facet arthropathy at multiple levels, and a disc bulge without any compressive lesion. (*Id.*) Dr. Espiritu did not find any surgical indication, stating Claimant's symptoms were "more consistent with an inflammatory condition or a polymyalgia or possibly even fibromyalgia." (*Id.*) He referred Claimant to rheumatologist, Robert Wisco, M.D.

Claimant saw Dr. Wisco on November 9, 2015. (*Id.* at 839-41.) Dr. Wisco noted that although the physicians at the Mayo Clinic encouraged Claimant to enroll in a pain management program, she "could not perform." (*Id.* at 839.) On examination, Claimant had grossly normal curvatures in her thoracolumbar spine, trace tenderness "from about L3 to S1," and some tenderness over the sacroiliac regions. (*Id.* at 840.) Claimant's paraspinous muscles and super gluteal area had mild tenderness, her hips were nontender, she had full range of motion in her hips, adequate muscle strength in all four extremities, a grossly normal sensory examination to light touch, and a normal gait. (*Id.*) Dr. Wisco diagnosed Claimant with chronic extreme lower back pain and superior gluteal discomfort. (*Id.* at 841.) Dr. Wisco did not see any rheumatologic problem that

---

[15] The ALJ's decision contains a typographical error stating that Claimant could not stand on her toes. (AR at 19.)

explained Claimant's difficulty, wondered whether Claimant "might have some component of sacroiliac joint irritation," and recommended she return to Dr. Espiritu for sacroiliac joint injections. (*Id.*)

The ALJ correctly noted that Claimant saw ARNP Kelly Bean for most of her subsequent treatment. (*Id.* at 19.) Claimant saw Ms. Bean in December 2015 for a wellness exam. (*Id.* at 845.) Ms. Bean noted that Claimant did not finish a physical therapy program for back pain. (*Id.*) On examination, Ms. Bean noted moderate bilateral flank pain upon inspection and palpation at the SI joints. (*Id.* at 848.) Ms. Bean also noted that she had discussed with Claimant her "grave concerns with [Claimant's] lifestyle choices and the risks to her health . . . [of] combined inactivity, smoking and poor diet[, which] are all causing significant health concerns." (*Id.* at 850.) Claimant returned to Ms. Bean in February 2016 complaining that muscle relaxants and Tramadol were not helping her back pain. (*Id.* at 865.) Ms. Bean increased Claimant's Tramadol dosage, counseled Claimant on diet, and recommended a walking program. (*Id.*) Ms. Bean "discussed with [Claimant] that weight loss and regular exercise is the only thing that is going to reduce her pain; she has been working on this and has lost 4 [pounds] and is trying to walk more. She refuses to go back to PT as it 'makes it worse.'"[16] (*Id.*) *See Kelley v. Barnhart*, 372 F.3d 958, 961 (8th Cir. 2004) ("failure to follow prescribed medical treatment without good cause is a basis for denying benefits") (citing *Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995)).

---

[16] Claimant admitted at the hearing that her weight contributes to her back problems:

[ALJ]: Do you feel like your weight contributes to an inability to work in any way?

A: Yes.

[ALJ]: How so?

A: They say if I lose weight that I will feel a lot better and my back probably won't hurt.

(AR at 54.)

The ALJ acknowledged that Claimant testified that "her biggest problems were not being able to walk long distances, bend, sit or stand." (*Id.* at 18.) Claimant also testified that injections did not help with the pain she experiences from bulging discs and that oxycodone only provides slight relief. (*Id.*) At the hearing, Claimant estimated she could sit for 20-to-25 minutes at a time, stand for 10-or-15 minutes at a time," and lift more than a gallon of milk. (*Id.* at 18, 44.)[17] She also testified that she does some vacuuming; cooking; and laundry, although her husband carries the full baskets down to the basement for her. (*Id.* at 18, 56.) The ALJ gave Claimant's hearing testimony "careful consideration[,] but ultimately little weight." (*Id.* at 22.) The ALJ reasoned that while Claimant "did not appear to make any deliberately false or misleading statements, . . . her subjective statements were at times inconsistent with the objective medical evidence." (*Id.*) The ALJ also considered the hearing testimony of Claimant's daughter, Cheyanne Matheny. (*Id.* at 18.) Ms. Matheny testified, in pertinent part, that she lived with Claimant until one month prior to the hearing and helped Claimant with housework because Claimant's "back would give her some pain." (*Id.* at 18, 63.)

Finally, the ALJ considered the opinions of state agency consulting physicians Charles Korte, M.D. and Jan Hunter, D.O. (*Id.* at 23.) On January 10, 2017, Dr. Korte limited Claimant to "light work with the following restrictions: standing and/or walking for four hours in an eight-hour day; no climbing of ladders, ropes and scaffolds; occasional climbing of ramps and stairs, as well as other postural activities; and avoiding concentrated exposure to hazards due to nonepileptic spells." (*Id.* (citing AR at 86-88).) On June 20, 2017, "Dr. Hunter largely affirmed this analysis, albeit with different standing and walking requirements." (*Id.* (citing 111-13).) The "different standing and

_____

[17] Claimant testified that if she carries two gallons of milk at a time from the car after grocery shopping, she has to sit down when she gets in the house. (*Id.* at 44.)

walking requirements" mentioned by the ALJ were that Claimant could stand and/or walk six hours in and eight-hour day, rather than four-hours. (*Id.* at 111.) Both Dr. Korte and Dr. Hunter provided long explanations for their conclusions (*Id.* at 88-89, 112-14.) Dr. Hunter stated their conclusions most succinctly: "While the claimant has severe impairments, her reported restrictions are not entirely supported with the clinical evidence." (*Id.* at 114.)

After the ALJ considered all this evidence, he concluded,

> Overall, the undersigned finds that the claimant's allegations concerning the intensity, persistence and limiting effects of her symptoms are less than fully consistent with the treatment records. The claimant alleged debilitating back pain, but imaging studies revealed only mild findings. An orthopedic surgeon did not identify her as a surgical candidate. Her medical examinations displayed evidence of facet oriented back pain, but were generally unremarkable otherwise. Despite a history of injections, most of her treatment was medication-oriented. Significantly, Ms. Bean recommended exercise, including a walking program, for weight loss, suggesting that the claimant was capable of at least some exertional activity. However, she would be limited to light work with only occasional postural activities.

(*Id.* at 22.) Claimant's conservative course of treatment can weigh against a claim of disabling impairment. *See Milam v. Colvin*, 794 F.3d 978, 985 (8th Cir. 2015). In addition, as the ALJ noted, a health care provider's recommendation to engage in physical activity is inconsistent with a finding of a finding of disability. *Moore*, 572 F.3d at 524. This factor weighs against giving the opinion more weight.

### e. *Specialization*

"[G]enerally [the ALJ will give] more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist." 20 C.F.R. § 404.1527(c)(5). Dr. Lukken is a specialist in pain management. This factor weighs in favor of giving the opinion more weight.

## f.    Conclusion

After a thorough review of the entire record, I find that the ALJ's opinion is supported by substantial evidence on the record as a whole and should not be disturbed. *See Hacker*, 459 F.3d at 937 (decision is not outside that zone of choice simply because the court might have reached a different decision). The ALJ's conclusion on this issue is affirmed.

## D.    Whether the ALJ Proffered a Hypothetical to the VE that was Supported by the Record

At the hearing, the ALJ proffered two hypotheticals to the VE.   The first hypothetical described the following individual:

> [A]ssume an individual with claimant's same age, education and past work experience.  Exertionally let's start at the light level, occasional ramps, stars, no ladders, ropes or scaffolds, occasionally balance, stop, kneel, crouch and crawl, no exposure to hazards such as unprotected heights, moving mechanical parts, no operation of a motor vehicle as part of the job duties, mentally limited to simple and routine tasks, simple work-related decisions, occasional changes in job duties, occasional contact with the public and coworkers.  Are there jobs available in the national economy for such a person?

(AR at 68-89.)  The VE testified that a person with these limitations could perform the jobs of housekeeper/cleaner, inspector/packer, and garment bagger.  (*Id.* at 69.)  For his second hypothetical, the ALJ asked the VE to assume the same individual, but to change the exertional level to sedentary.  (*Id.*)  The VE testified that the previously-mentioned jobs would no longer be available, but that the jobs of final assembler, document preparer, and table worker would be available to such a person.  (*Id.*)  The VE also testified that generally speaking, most employers will tolerate no more than half-a-day of missed work a month or an employee who is off-task more than ten-percent of the work day.  (*Id.* at 70.)  The VE stated that in a competitive work environment, employers will

not tolerate unscheduled breaks that equate to more than ten-percent of the work day. (*Id.*)

The ALJ's first hypothetical and the VE's answer to that hypothetical became the RFC and the jobs the ALJ relied on at step 5. (*Id.* at 17, 25.)

### 1. *Legal Standard for Evaluating the Hypothetical and Claimant's Arguments*

In order to constitute substantial evidence, a VE's testimony must be based on a hypothetical that captures the "concrete consequences" of the claimant's deficiencies. *Scott v. Berryhill,* 855 F.3d 853, 857 (8th Cir. 2017) (citing *Lacroix v. Barnhart*, 465 F.3d 881, 889 (8th Cir. 2006) (quotation omitted); *Porch v. Chater*, 115 F.3d 567, 572 (8th Cir. 1997)). The hypothetical must include only the impairments that are substantially supported by the record as a whole. *Lacroix*, 465 F.3d at 889.

Claimant argues that "[b]ased on an erroneous RFC determination and resulting hypotheticals to the Vocational Expert, the ALJ found that Berke could perform other work." (Doc. 15 at 9.) Claimant first argues that the hypotheticals were improper because of the ALJ's failure to find her atrial fibrillation, headaches, and asthma severe impairments. (*Id.* at 9-10.) She next argues that the hypotheticals were improper because the ALJ failed to "properly consider her low GAF and IQ scores regarding her mental health and intellectual functioning." (*Id.* at 10.) Claimant also asserts that the hypotheticals were improper because the ALJ failed to give appropriate weight to Dr. Lukken's opinion and Claimant's testimony and failed to analyze Ms. Matheny's testimony. (*Id.* at 10-13.)

### 2. *Analysis*

#### a. *Arguments Previously Addressed*

The Commissioner argues,

[T]he Court need not address plaintiffs step five argument – that the ALJ's hypothetical was inadequate - because it is premised upon the Court finding that the ALJ improperly evaluated plaintiff's RFC finding. However, the Commissioner notes that while plaintiff challenges the ALJ's step two and three findings, she did not challenge the RFC finding. Furthermore, contrary to plaintiff's argument, she has not met her burden of proving the need for any additional limitations, nor has she suggested what additional limitations the ALJ should have included in the RFC finding. *See Buford v. Colvin,* 824 F.3d 793, 796 (8th Cir. 2016) (plaintiff's burden to prove RFC). Thus, plaintiff's RFC argument is insufficiently developed to preserve judicial review and is therefore waived. *See Gregg v. Astrue,* 615 F.3d 932, 938 (8th Cir. 2010); *see also Aulston v. Astrue,* 277 F. App'x 663, 664 (8th Cir. 2008) (unpublished) (undeveloped argument is waived).

Nevertheless, as discussed above, the ALJ clearly discussed all of plaintiff's impairments, including the nonsevere impairments, when he assessed the RFC finding (Tr. 12-13). In fact, the ALJ specifically explained that he must consider all of the claimant's impairments, including impairments that are not severe (Tr. 11-12). *See* 20 C.F.R, §§ 404,1520(e), 404,1545; SSR 96-8p. In addition, the ALJ considered plaintiff's mental impairments at step three, including her IQ scores (Tr. 14-17). As explained above, after considering the record evidence, the ALJ ultimately found that there was "no evidence of a disability-level intellectual disorder meeting or equaling listing 12.05(B)["] (Tr. 16-17). Thus, the ALJ properly considered plaintiff's physical and mental impairments and provided only limitations in the RFC finding that the record as a whole supported. Therefore, plaintiff has not established error.

(Doc. 16 at 21-22.)

As discussed above, the Commissioner is correct that the ALJ's decisions related to whether Claimant's atrial fibrillation, headaches, asthma, and the severity of Claimant's intellectual impairments were supported by the record as a whole. Accordingly, the ALJ properly considered these impairments when crafting Claimant's RFC. (AR 17 (ALJ considered "entire record" and "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical

evidence and other evidence" when crafting Claimant's RFC).) In addition, I have also found that the ALJ's decision to give Dr. Lukken's opinion little weight is supported by the record as a whole. Therefore, the ALJ properly considered his opinion when crafting Claimant's RFC.

However, the Commissioner is not correct that Claimant has not specifically challenged the ALJ's RFC finding. Although Claimant styles her argument as one about "the ALJ's error at step five of the analysis," she begins her argument in the following way: "Based on an erroneous RFC determination and resulting hypotheticals to the [VE], the ALJ found that Berke could perform other work." (Doc. 15 at 9.) In addition, Claimant's arguments challenge the consideration the ALJ gave to certain pieces of evidence, rather than anything specific in the hypotheticals the ALJ posited to the VE. (*Id.* at 10-14.) Therefore, although Claimant states she is challenging the hypotheticals, what she actually challenges are the ALJ's decisions upon which he based the RFC and eventual hypotheticals.

### b.     *Evaluation of Claimant's Testimony*

Claimant asserts that the ALJ failed to give her testimony appropriate weight, specifically the portion of her testimony where Claimant stated, she "can only sit in an office style chair for about 20-25 minutes before she has to stand up, and then after 10-15 minutes, she can sit back down." (Doc. 15 at 11 (citing AR 43).) The ALJ found that "the claimant's medically determinable impairments could reasonably be expected to cause some of her alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (AR at 18.) He also concluded that "the claimant's hearing testimony received careful consideration but ultimately little weight. She did not appear to make any deliberately false or misleading statements, but her subjective statements were at

times inconsistent with the objective medical evidence." (*Id.* at 22.) The ALJ noted that imaging studies showed only mild findings and that Dr. Espiritu did not think Claimant was a surgical candidate. (*Id.* at 22, 489-90, 817.) The ALJ also noted that while Claimant's examinations showed evidence of facet-based back pain, the examinations were largely unremarkable. (*Id.* at 22.) The ALJ considered these findings when he limited Claimant's RFC to light work with additional limitations. (*Id.*) The ALJ also noted that as of March 21, 2017, Claimant had not experienced a nonepileptic "spell" in over two years. (*Id.* at 22, 285.) The ALJ acknowledged that while Claimant had been treated at the Mayo Clinic for these spells in 2013, there is no evidence of a syncopal episode prior to the date last insured and no reliable information as to the frequency or severity of Claimant's spells. (*Id.* at 22.) The ALJ noted that Claimant continues to drive and hold a driver's license. (*Id.* at 22.) Claimant testified that her doctor has to complete paperwork from the Department of Transportation ("DOT") "basically explaining that, you know, [Claimant's] been doing good so far, you know, no incidents. . . . And then . . . . they extend my license longer." (*Id.* at 51.) However, Claimant testified that she has syncopal events "frequently. . . . two, three times a month. It can happen every day of the week." (*Id.* at 50.) Claimant is unconscious when she has one of these events and it can take up to twenty minutes before Claimant can move or talk. (*Id.*) Claimant testified that sometimes her daughter calls the ambulance when Claimant has a spell and Claimant is taken to the hospital where physicians have to record the incident and the incident "shows up when [her] doctor fills out the papers and has to report." (*Id.* at 51-52.) The ALJ found evidence that Claimant continued to drive and hold a driver's license was "evidence that the spells do not happen often enough to render her disabled." (*Id.* at 22.) The ALJ also found that if Claimant had been keeping her doctors apprised of her spells, her doctors would have been required to report to them to

the DOT, which would likely interfere with Claimant's ability to keep her driver's license. (*Id.*)

Claimant argues that the ALJ did not properly consider her testimony related to her subjective allegations of pain. (Doc. 15 at 11-12.) Specifically, Claimant argues that "the analysis an ALJ must make is not only whether the Plaintiff's subjective complaints are supported by the medical record, but also whether Plaintiff *believed* her medical and psychological problems and limitations were real." (Doc. 17 at 5.) Claimant also cites an Eastern District of California case that stands for the proposition that a claimant's ability to engage in limited daily activities does not necessarily demonstrate that a claimant has the ability to work. (*Id.* at 6 (citing *O'Bosky v. Astrue*, 651 F. Supp. 2d 1147, 1164 (E.D. Cal. 2009).) I will address the parties' arguments under the appropriate Eighth Circuit *Polaski* analysis. Claimant's arguments consist mostly of long quotations from two cases.

When a claimant suffers from a severe impairment, but the impairment does not meet or equal a disabling impairment listed in the regulations, the ALJ "will consider the impact of [the claimant's] impairment(s) and any related symptoms, including pain, on [the claimant's] residual functional capacity." 20 C.F.R. § 404.1529(d)(4). This determination involves a two-step process in which the ALJ first decides whether the claimant has a medically determinable impairment that could reasonably be expected to produce the claimant's symptoms and then evaluates the intensity and persistence of the claimant's symptoms. *Id.* § 404.1529(b),(c). When evaluating the claimant's subjective complaints during the second step, the ALJ considers the objective medical evidence, the claimant's work history, and evidence relating to the following factors ("the *Polaski* factors"): (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) [the claimant's] functional restrictions. *Polaski v. Heckler*,

739 F.2d 1320, 1322 (8th Cir. 1984); 20 C.F.R. § 404.1529(c)(3).[18] An ALJ is not required to methodically discuss each *Polaski* factor as long as the ALJ "acknowledge[es] and examin[es] those considerations before discounting [a claimant's] subjective complaints." *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) (*citing Brown v. Chater*, 87 F.3d 963, 966 (8th Cir. 1996)).

After considering the factors and evidence, the ALJ determines the extent to which the claimant's symptoms affect the claimant's capacity to perform basic work activities. *Id.* § 404.1529(c)(4). The claimant's "symptoms, including pain, will be determined to diminish [the claimant's] capacity for basic work activities to the extent that [the claimant's] alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Id.*

In this case, the ALJ found that Claimant had medically determinable impairments that could reasonably be expected to cause her alleged symptoms. (AR at 18.) The ALJ also found that Claimant was able to perform work in the national economy. (*Id.* at 25.)

The ALJ stated the following regarding Claimant's daily activities: that Claimant was able to drive a car, was "mentally capable of most daily living activities," could participate in housework and laundry, and could groom herself at an adequate level. (AR at 15, 21.)

While the Eighth Circuit, like the Eastern District of California, has repeatedly held that a claimant's ability to perform household chores does not necessarily mean the claimant can perform gainful work activity outside the home, as discussed above, the

_____

[18] The Code of Federal Regulations includes the additional factors of: (1) other treatment the claimant receives for pain relief; and (2) measures the claimant uses to relieve pain "(e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.)." 20 C.F.R. § 404.1529(c)(3)(v), (vi).

ALJ found that Claimant's allegations regarding the intensity, persistence, and limiting effects of her symptoms were not supported by the record. *See Ford v. Astrue*, 518 F.3d 979, 983 (8th Cir. 2008) (holding that daily activities of "washing a few dishes, ironing one or two pieces of clothing, making three or four meals each week, and reading" were not inconsistent with claimant's claim of pain or with an inability to hold a fulltime job). "[I]t is well-settled law that a claimant need not prove she [or he] is bedridden or completely helpless to be found disabled." *Reed v. Barnhart*, 399 F.3d 917, 923 (8th Cir. 2005) (citations and internal quotation marks omitted). *But see* (AR at 22 (ALJ noting that while physicians found facet-oriented pain, most examinations were unremarkable, imaging showed only mild findings, Dr. Weis did not find Claimant a candidate for surgery, and Ms. Bean recommended exercise, including a walking program, which indicated that Claimant was capable of at least some exertional activity).)

Claimant asserts that the ALJ improperly weighed her ability to drive a car as merely another "daily activity." Claimant misunderstands the importance of her ability to legally drive a car. Because Claimant's physician must sign paperwork for the DOT attesting that Claimant has not had any syncopal events in order for Claimant to keep her driver's license, Claimant's ability to renew her license on a regular basis means more than the ability to physically and mentally handle the rigors of driving. It also means that Claimant has not had any incidents of syncope since the last time she renewed her driver's license, which, as previously discussed undermines Claimant's testimony that she has syncopal spells "two, three times a month. . . . [or] every day of the week." (AR at 50.)

Claimant also argues that her case is analogous to *Holmstrom v. Massanari*, in which the ALJ held that "[a]lthough the record credited by the ALJ . . . may not contain sufficient objective medical evidence to support Holmstrom's subjective complaints, the record *as a whole* does support them." 270 F.3d 715, 722 (8th Cir. 2001) (emphasis in original). *Holmstrom* reversed an ALJ's decision to deny benefits to a claimant, in part,

based on the testimony of the claimant and claimant's sister-in-law, who testified about the severity of Claimant's back pain. *Id.* at 719, 722. The court also considered corroborating medical evidence first presented to the Appeals Council. *Id.* at 717, 722. *Holmstrom* held that the ALJ's hypotheticals should have included a limitation that the claimant had to lie down several times during the work day, something both the claimant and his sister-in-law testified Claimant needed to do and that evidence first submitted to the Appeals Council supported. *Id.* at 719, 722.

Claimant does not explain how her case is similar to *Holmstrom* other than to say that she testified that she "can only sit in an office style chair for about 20-25 minutes before she has to stand up, and then after 10-15 minutes, she can sit back down," which makes her case "very similar to" *Holmstrom*. (Doc. 15 at 11.) While it is true that the claimants in both *Holmstrom* and the case at bar testified that they needed to change positions often, the ALJ in *Holmstrom* correctly relied on the record as a whole, which included both objective medical evidence and hearing testimony. 270 F.3d at 722. However, in spite of the arguable similarities in hearing testimony, the claimant in *Holmstrom* was much more limited in the rest of his daily activities than is Claimant in the case at bar who drives; shops with a motorized cart; helps with household chores; and takes care of her own grooming. "During a July 1998 interview, . . . Holmstrom reported that his daily activities comprised: getting up and sitting around until his back hurt, then lying down until it felt better, then repeating this pattern until he went to bed at night." *Id.* at 719 n.4. In addition, the objective medical evidence of severe back problems in *Holmstrom* was much stronger than it is here, including evidence supporting a need to lie down to alleviate pain and evidence that the claimant was in pain at doctors'

appointments.[19]  *Id.* at 718-19.  Thus, *Holmstrom* merely stands for the proposition that a court must evaluate an ALJ's decision for supporting evidence in the record as a whole, not for the proposition that a claimant's hearing testimony is more important than all other evidence.  (*See* Doc. 15 at 12 (Claimant's brief) (citing *Carlson v. Astrue*, 682 F. Supp. 2d 1156, 1165 (D. Or. 2010), which states that "[o]nce a claimant establishes an impairment that could reasonably cause the reported symptoms, the ALJ may not require that medical evidence corroborates the degree of symptom testimony the claimant proffers.  However the ALJ may consider a claimant's medical source record in conjunction with other credibility factors, including a physician's observations.") (internal citations omitted).)[20]

---

[19]     X-rays, CT scans and MRIs . . . show narrowed disc spaces, spur formation, degenerative disc disease, and disc bulges or herniations in the lower lumbar and upper sacral region of Holmstrom's spine. X-rays from 1996 show a "complete loss" of the disc space between two vertebrae in his lower back. Throughout his time in California, Holmstrom took prescribed medications for his back, including daily doses of muscle relaxants, 2400 milligrams of ibuprofen, and painkillers containing codeine for "breakthrough pain." In attempts to reduce his back pain, Holmstrom underwent trigger point injections, physical therapy, hypnosis, and use of a transcutaneous electrical nerve stimulator unit. The medical records indicate that, on occasion, Holmstrom received temporary and partial pain relief from these treatments.

.   .   .

After the ALJ issued her decision, the Appeals Council accepted into the record additional medical evidence covering a period up to and including November 5, 1998. This additional evidence included records from office visits to Dr. Kopacz. On August 20, Holmstrom reported that his pain decreased only when he laid down flat, and Dr. Kopacz noted that Holmstrom was physically uncomfortable and changed positions frequently in attempts to relieve his pain.

*Holmstrom*, 270 F.3d at 718-19.

[20] I find that the ALJ properly "acknowledged and examined considerations" related to the other *Polaski* factors.  *Lowe*, 226 F.3d at 972.

Claimant's final argument related to her testimony is that the ALJ had to consider whether Claimant "*believed* her medical and psychological problems and limitations were real. . . . [and the failure to do so], constitutes error." (Doc. 17 at 5.) For support, Claimant cites the following passage from *Bright-Jacobs v. Barnhart*,

> This Court agrees that the claimant's testimony as to her medical conditions generally contradicts the objective medical evidence as determined by her treating physicians. Therefore, in the abstract, an ALJ could find that her testimony is not credible. However, that is precisely the nature of her disabling somatization disorder: the claimant actually believes that she is suffering from disabling medical conditions even though such medical conditions are illusory or less severe. Thus, in order to properly evaluate the claimant's credibility, the ALJ must determine whether the claimant actually believes she suffers from the enumerated severe disabling medical conditions. In assessing and rejecting the claimant's credibility, here, the ALJ rejected the claimant's credibility because it was not supported by objective medical findings. Tr. 501–19, 520–22, 524, 528, FOF 5. His failure to ascertain whether the alleged medical problems were real to the claimant constitute reversible error (i.e. a failure to properly evaluate the claimant's credibility).

386 F. Supp. 2d 1295, 1333 (N.D. Ga. 2004).

> A "somatization disorder," or "somatic symptom disorder" is

> characterized by an extreme focus on physical symptoms — such as pain or fatigue — that causes major emotional distress and problems functioning. [People with this disorder] may or may not have another diagnosed medical condition associated with these symptoms, but [their] reaction to the symptoms is not normal.

> [People with this disorder] often think the worst about [their] symptoms and frequently seek medical care, continuing to search for an explanation even when other serious conditions have been excluded. Health concerns may become such a central focus of [their lives] that it's hard to function, sometimes leading to disability.

Mayo Clinic, Somatic symptom disorder, https://www.mayoclinic.org/diseases-conditions/somatic-symptom-disorder/symptoms-causes/syc-20377776#:~:text=

Somatic%20symptom%20disorder%20is%20characterized,the%20symptoms%20is%20
not%20normal.

The case at bar is easily distinguished from *Bright-Jacobs* because there is no
allegation that Claimant has a somatization disorder. The holding in *Bright-Jacobs* was
limited to the unique facts of that case and has no bearing on Claimant's case.

Therefore, although Claimant's case may have supported a different outcome, "[i]f
substantial evidence supports the Commissioner's decision, [I cannot] reverse even if [I]
might have decided the case differently." *Lawrence v. Saul*, 970 F.3d 989, 996 (8th Cir.
2020) (quoting *Strongson v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir. 2004)). The ALJ's
decision on this issue is affirmed. The ALJ properly weighed Claimant's testimony when
crafting the RFC.

### c.   *Evaluation of Ms. Matheny's Testimony*

Claimant argues that the ALJ "completely failed to analyze the testimony of
[Claimant's] adult daughter, Cheyenne Matheny." (Doc. 15 at 12.) In support of her
argument that this "complete failure . . . constitutes error," Claimant cites cases from
the Northern District of Georgia and the Ninth Circuit that hold that family members can
be valuable sources of information about claimants' impairments and that rejecting family
members' testimony on the basis of familial bias is improper.[21] (*Id.* at 12-13 (citations
omitted).) Claimant, however, does not explain how Ms. Matheny's testimony provides

---

[21] The Eighth Circuit does not allow an ALJ to dismiss a family member's testimony "by
summarily stating that 'individuals at hearings are more likely to present themselves, or their
loved ones, in the light most favorable to benefit awarding'" without sufficiently identifying
discrepancies in the testimony. *Neely v. Shalala*, 997 F.2d 437, 441 (8th Cir. 1993)
(quoting *Ludden v. Bowen,* 888 F.2d 1246, 1248 (8th Cir. 1989)). If, however, the testimony
merely corroborates the claimant's testimony or conflicts with the medical evidence, an ALJ
may dismiss the testimony. *Ostronski v. Chater*, 94 F.3d 413, 419 (8th Cir. 1996).

59

valuable insight into Claimant's condition or how it is free from bias.  Again, Claimant merely summarizes Ms. Matheny's testimony and then quotes almost a page-and-one-half of block quotes from the cases without any legal analysis.  (*Id.*)

Ms. Matheny testified that she helped her mother with housework because Claimant's back was in pain, Claimant "couldn't really move," and it was "hard for her to go up and down the steps sometimes" because of pain, and testified about Claimant's "spells."  (*Id.* at 64-66.)  Ms. Matheny testified that Claimant's spells can last an hour or two and happen once-or-twice-per-day and that Claimant mumbles or does not say much when she has spells.  (*Id.* at 64-65.)  The ALJ summarized this testimony, but did not assign it specific weight.  (*Id.* at 18.)

> [S]tatements of lay persons regarding a claimant's condition must be considered when an ALJ evaluates a claimant's subjective complaints of pain." *Willcockson v. Astrue,* 540 F.3d 878, 880–81 (8th Cir. 2008) (holding that ALJ's failure to refer in his decision to lay testimony warranted remand); *see also* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). *But see Buckner v. Astrue,* 646 F.3d 549, 559–60 (8th Cir. 2011) (although ALJ did not expressly address claimant's girlfriend's statement in decision, ALJ's error did not require remand because evidence that discredited claimant's claims also discredited girlfriend's claims; ALJ's "arguable deficiency in opinion-writing technique" had no bearing on outcome of claimant's case).

*Dawdy v. Astrue*, No. C10-4063-MWB, 2011 WL 5080146, at *23 (N.D. Iowa Oct. 25, 2011), *R. & R. adopted*, 2012 WL 176576 (N.D. Iowa Jan. 20, 2012).

In *Buckner*, the court declined to remand the case for reconsideration of the claimant's girlfriend's statement that the ALJ did not mention in the decision.  646 F.3d at 559-60.

> . . . [W]e cannot determine from the record whether the ALJ considered her statements at all. At the same time, . . . the same evidence that the ALJ referred to in discrediting Buckner's claims also discredits the girlfriend's claims. Specifically, Buckner's girlfriend stated that Buckner cannot watch

the children when she leaves the house. As noted above, the ALJ observed that Buckner, in his disability questionnaire and his hearing testimony, "stated that he was able to care for his son." Buckner's girlfriend also claimed that Buckner could not work, would run out of breath easily, and had no energy. Although the ALJ did not address all of these specific claims, the ALJ did find that Buckner's own statements and hearing testimony "show that he engages in a range of daily activities inconsistent with his allegation of disabling hypertension, headaches, back pain, hand cramps, shortness [of] breath, chest pains, depression and anxiety." Finally, the decision here did not suffer from the other deficiencies . . . most notably, as discussed *supra,* the ALJ here did sufficiently assess Buckner's credibility. Thus, we hold that the ALJ's "arguable deficiency in opinion-writing technique," . . . had no bearing on the outcome of Buckner's case and does not require remand.

*Id.* at 560 (internal citations omitted; second set of brackets in original).

The ALJ properly considered Ms. Matheny's testimony. That was all the ALJ was required to do because an ALJ's failure to mention specific evidence does not mean he did not consider it—especially in this case where the ALJ mentioned the evidence. *See Wildman*, 596 F.3d at 964. Moreover, ALJs are only required to assign weight to opinions. *See* SSR 06-03p, 2006 WL 2329939, at **5-6 (discussing opinions from non-medical sources). Testimony is not an opinion. Finally, for the most part, Ms. Matheny's testimony mostly corroborated Claimant's testimony regarding her syncopal events, which conflicted with the medical evidence that Claimant had not experienced a syncopal event for years. *See Ostronski v. Chater*, 94 F.3d 413, 419 (8th Cir. 1996); *See also* (AR at 22, 285).

Here, it is obvious that the ALJ considered Ms. Matheny's testimony because the ALJ mentioned the testimony in his decision. (AR at 18.) In addition, to the extent the ALJ should have discussed the testimony further, the same evidence the ALJ cited to discount Claimant's claims related to her syncopal events and back impairments would

Case 5:19-cv-04042-MAR   Document 19   Filed 11/20/20   Page 61 of 62

also discount Ms. Matheny's testimony.  Therefore, further discussion was not required. Accordingly, this part of the ALJ's decision is affirmed.

> **d.** **_Effect of ALJ's Decisions on Hypotheticals at Step Five_**

I find that because the ALJ properly analyzed and weighed the evidence that Claimant challenges, the ALJ's RFC was not erroneous. Accordingly, the hypotheticals the ALJ proffered to the VE were based on the impairments that are substantially supported by the record as a whole.

> **IV.** **CONCLUSION**

For the foregoing reasons, the decision of the ALJ is **affirmed.**  Claimant's Complaint **(Doc. No. 3)** is **dismissed with prejudice.**

**IT IS SO ORDERED** this 20th day of November, 2020.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa